**MOTORSPORT MARKETING, INC., Respondent,**

v.

**WIEDMAIER, INC., et al., Appellants.**

**No. WD 65689.**

Missouri Court of Appeals, Western District.

July 11, 2006.

Gardiner B. Davis, Kansas City, MO, for Respondent.

Errol D. Taylor, St. Joseph, MO, for Appellants.

Before HOWARD, P.J., and HOLLIGER and HARDWICK, JJ.

VICTOR C. HOWARD, Presiding Judge.

Wiedmaier, Inc. and Marsha A. Wiedmaier ("Marsha") appeal from the trial court's judgment in favor of Motorsport

Marketing, Inc. ("Motorsport") and against Wiedmaier, Inc. and Marsha on Motorsport's petition to recover monies due on open account and on personal and corporate guaranty. Wiedmaier, Inc.'s[1] sole point on appeal is that the trial court erred in finding that Michael Wiedmaier ("Michael") was acting as the apparent agent of Wiedmaier, Inc. because Marsha's act in signing a credit application on behalf of Wiedmaier, Inc. and having her son, Michael, fax the document to Motorsport was not sufficient to invest Michael with apparent authority to act as Wiedmaier, Inc.'s agent in that (1) Michael altered the credit application to reflect himself as an owner; (2) all of Motorsport's dealings with Wiedmaier, Inc. were based upon the statements and representations of Michael; and (3) Wiedmaier, Inc. and the owners of Wiedmaier, Inc. had no contact with Motorsport and were totally ignorant and unaware of Michael's dealings with Motorsport until after Michael terminated his employment with Wiedmaier, Inc. and moved to Columbus, Ohio.

We affirm.

### Factual and Procedural Background

Plaintiff Motorsport Marketing, Inc., a Missouri corporation, is a marketer and wholesale distributor of racing collectibles and memorabilia. Defendant Wiedmaier, Inc., a Missouri corporation, owns and operates Wiedmaier Truck Stop in St. Joseph, Missouri. Jerry Wiedmaier ("Jerry") is the president of Wiedmaier, Inc., and his wife, defendant Marsha Wiedmaier, is secretary/treasurer. Jerry and Marsha are the only stockholders of Wiedmaier, Inc.

Michael Wiedmaier is Jerry and Marsha's son. Until late 2003, Michael worked for Wiedmaier, Inc. as a fuel truck operator. He has never owned an interest in Wiedmaier, Inc. Michael was part owner of Extreme Diecast, L.L.C., an Ohio Limited Liability Corporation, along with his business partner, Steve Darrah. Michael and Darrah formed Extreme Diecast in the spring of 2003. Extreme Diecast marketed NASCAR merchandise over the internet and at racing events. In late 2003, Michael left his employment with Wiedmaier, Inc. and moved to Columbus, Ohio.

Russ Dickey, Motorsport's marketing director, first met Michael Wiedmaier in October 2002. At that time, Michael expressed interest in selling products offered by Motorsport in his family's truck stops and travel centers. Following this meeting, Russ Dickey gave Michael's business card to Motorsport's sales manager, Lesa James, and James subsequently contacted Michael by telephone. James testified that Michael "was representing Wiedmaier, Inc., or Wiedmaier Travel Centers."

Michael had discussed with Marsha the possibility of Wiedmaier, Inc. purchasing product from Motorsport to sell at the truck stop. On March 28, 2003, Motorsport faxed a credit application to Wiedmaier Truck Stop. Michael presented the account application to Marsha. Marsha signed the application in her capacity as "Secretary–Owner" of Wiedmaier, Inc. Marsha also signed as "Individual Guarantor/Owner" of all purchases made by Wiedmaier, Inc. The portion of the account application on which the names of all owners or principals of the applicant were to be listed remained blank at the time Marsha signed the application. Michael received the application back from Marsha following the execution of her two signa-

---

1. For ease of reference, appellants Wiedmaier, Inc. and Marsha Wiedmaier will be referred to as Wiedmaier, Inc.

tures. Michael then completed the owner identification portion of the application, listing as owners his father, Jerry Wiedmaier, his mother, Marsha Wiedmaier, and himself. The true owners of Wiedmaier, Inc. were Jerry and Marsha Wiedmaier. Michael Wiedmaier has at no time held any ownership interest in Wiedmaier, Inc.

On April 10, 2003, Michael faxed the altered credit application to Motorsport. Motorsport then investigated Wiedmaier, Inc.'s credit, determined it to be satisfactory, and approved the opening of a credit account. James's assistant, Lyndsay Sims, then set up the account and called the truck stop and spoke with Michael to let him know that the account had been established. Upon the opening of the account, Michael proceeded to use that account, either personally or through an authorized representative, to order merchandise on credit from Motorsport. Motorsport dealt exclusively with Michael on the Wiedmaier, Inc. account because, as James testified, "it was represented he was the owner/agent for the account."

Following Michael's instructions, Motorsport shipped its merchandise to various addresses, including the address of the principal place of business of Wiedmaier, Inc. Motorsport also sent product to Wiedmaier, Inc. d.b.a. Extreme Diecast in Columbus, Ohio. James's understanding was that Wiedmaier, Inc. was opening a truck stop in Columbus. Motorsport also sent product to other addresses in St. Joseph, Missouri. James testified that the change of address was approved by Michael because the truck stop did not have a warehouse facility in which to put any more product, and it was her understanding that that address was where the product was going to be kept. Motorsport also submitted account statements on the Wiedmaier, Inc. account to various addresses, including that of the principal place of business

of Wiedmaier, Inc. Tina Owens, cashier at Wiedmaier, Inc.'s truck stop, testified that when anything arrived at the truck stop from Motorsport, be it merchandise or account statements, it was set aside for Michael.

Marsha testified that to her knowledge, nobody at Wiedmaier, Inc. ever placed an order with Motorsport. She testified that she "fully intended to order product" from Motorsport, but she was never contacted by them. She testified that she knew Michael was buying merchandise from Motorsport, and that Wiedmaier, Inc. bought NASCAR merchandise from Extreme Diecast.

Jerry testified that Michael was an employee of Wiedmaier, Inc., that Michael drove a fuel truck for the company, and that Michael was not an officer or owner of Wiedmaier, Inc. and had no authority to enter into any contracts on behalf of Wiedmaier, Inc. He testified that he had never had contact with anyone from Motorsport, and to his knowledge, Wiedmaier, Inc. had never received any product from Motorsport or received any billing statements from Motorsport. Jerry testified that Wiedmaier, Inc. purchased diecast automobiles and other merchandise from Extreme Diecast.

When asked at trial what "Extreme Diecast" referred to, James testified that she was told either directly by Michael or through her assistant that

Extreme Die Cast was referred to as an expansion of Wiedmaier Travel Center, which in a lot of our accounts that's normal. They'll have a truck plaza, and then they'll call the die cast division a different thing within the store. And that's what Extreme Die Cast was being described as being, was an extension of Wiedmaier, Inc., an extension within the travel center.

She further testified that Extreme Diecast orders were "all under the Wiedmaier, Inc. [account]" and "came through the Wiedmaier name." She further testified that Michael told her that Extreme Diecast was a new company that was going to be operating under the umbrella of the Wiedmaier, Inc. name.

Patrick Rainey, president of Motorsport, also testified that James and Sims told him that Michael said Extreme Diecast was an expansion opportunity through Wiedmaier, Inc. He further testified that Michael represented Extreme Diecast to be part of Wiedmaier, Inc.

Sims testified that she spoke to Steve Darrah on the phone "maybe once," and that Michael told her Darrah was going to be helping with the diecast portion of their business in Ohio. Sims testified that Michael requested that Motorsport ship items to alternate addresses when he felt that there was not enough room for new shipments at the truck stop. Sims testified that "drop shipping," or shipping to an alternate address at the customer's request but billing to the same company, was common. She testified that Extreme Diecast was the diecast portion of the Wiedmaier travel stop under the umbrella of Wiedmaier, Inc.

In late fall 2003, Patrick Rainey, president of Motorsport, asked Michael to come in to discuss the account being in arrears. James and Sims were also present at that meeting. When Rainey mentioned talking to Marsha about the account, Michael "got pretty agitated" and said that he did not want Motorsport to call Marsha. Rainey agreed not to contact Marsha, and instead to work with him through a payment schedule. Sims testified that at that meeting, Michael said that the past due charges were "his responsibility," and she was "very shocked" to hear that.

Subsequently, in January or February 2004, after Michael stopped making payments according to the agreed-upon payment schedule, Rainey decided to meet with Marsha at the truck stop. Rainey testified that the first thing Marsha said to him when they met was "why in the world would you give Michael that kind of credit line?" Rainey testified that there was Motorsport merchandise on display in plain view at the truck stop. When Motorsport presented the outstanding account balance of $93,388.58 to Marsha, she refused to pay it. Seeking to recover the outstanding account balance, Motorsport filed its first amended petition against Wiedmaier, Inc. and Marsha Wiedmaier, to recover monies due on open account and on personal and corporate guaranty.

Following trial, the trial court entered its judgment, in which it concluded that in opening an account and ordering merchandise on the account, Michael was acting as the apparent agent of Wiedmaier, Inc. The trial court determined that Marsha's own conduct and acquiescence in Michael's conduct created an appearance of affairs which would cause a reasonable person to believe that Michael had the authority of Wiedmaier, Inc. to transact business with Motorsport. The trial court also found that Motorsport dealt with Michael in good faith and in the exercise of reasonable prudence with the actual belief that Michael was, in fact, the agent of Wiedmaier, Inc. The court found that Marsha, as personal guarantor of the account, was individually liable for all purchases from Motorsport for which Wiedmaier, Inc. was found liable in the judgment. The trial court entered judgment for Motorsport and against Wiedmaier, Inc. on Count I of Motorsport's petition, and against Marsha on Count III of the petition, jointly and severally, in the amount of $93,388.58 in principal; $13,406.38 in prejudgment interest through May 30, 2005; and attorneys'

fees and expenses in the amount of $25,165.93. Wiedmaier, Inc. and Marsha Wiedmaier appeal.

## Standard of Review

 In a court-tried case, we will sustain the judgment of the trial court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). "[W]e view all evidence in a light that supports the circuit court's judgment and disregard all contrary evidence." *Sherman, Taff & Bangert, P.C. v. Clark Equip. Co.,* 133 S.W.3d 125, 126 (Mo.App. W.D.2004).

## Discussion

Wiedmaier, Inc.'s sole point on appeal is that the trial court erred in finding that Michael was acting as the apparent agent of Wiedmaier, Inc. because the act of Marsha in signing a credit application on behalf of Wiedmaier, Inc. and having her son, Michael, fax the document to Motorsport was not sufficient to invest Michael with apparent authority to act as Wiedmaier, Inc.'s agent in that (1) Michael altered the credit application to reflect himself as an owner; (2) all of Motorsport's dealings with Wiedmaier, Inc. were based upon the statements and representations of Michael; and (3) Wiedmaier, Inc. and its owners had no contact with Motorsport and were totally ignorant and unaware of Michael Wiedmaier's dealings with Motorsport until after Michael terminated his employment with Wiedmaier, Inc. and moved to Columbus, Ohio.

Wiedmaier, Inc. argues that the trial court's order and judgment in favor of Motorsport was based entirely upon the court's finding and determination that Michael was the apparent agent of Wiedmaier, Inc. with authority to order Motorsport's merchandise on behalf of Wiedmaier, Inc. and that Motorsport could reasonably rely upon this apparent authority in dealing with Michael. Wiedmaier, Inc. contends that it is clear from the evidence and the trial court's findings that Michael did not have express authority from Wiedmaier, Inc. to purchase product from Motorsport on Wiedmaier, Inc.'s account, and it is also clear from the evidence that Wiedmaier, Inc., Marsha Wiedmaier, and Jerry Wiedmaier had no knowledge of Michael's conduct in purchasing product from Motorsport on Wiedmaier, Inc.'s account and they were totally ignorant of such conduct until after Michael Wiedmaier terminated his employment with Wiedmaier, Inc. and moved to Columbus, Ohio. Wiedmaier, Inc. contends that Marsha and Jerry became aware of Michael's conduct in February 2004, almost eleven months after the account was opened, approximately four months after the subject account was delinquent, and almost two months after Michael moved to Ohio.

Wiedmaier, Inc. contends that the trial court's finding that Marsha had reasonable cause to believe that Michael would fraudulently alter a business document in order to defraud Motorsport and Wiedmaier, Inc. is void of any evidentiary support. Wiedmaier, Inc. further notes that nobody from Motorsport ever contacted anyone at Wiedmaier, Inc. other than Michael concerning the establishment of a business relationship. Wiedmaier, Inc. contends that there is no evidence in this case that Marsha or Wiedmaier, Inc. committed any acts or engaged in any conduct that would lead Motorsport to believe that Michael possessed authority to act in the name of Wiedmaier, Inc. and purchase product from Motorsport on Wiedmaier, Inc.'s behalf.

"A principal is responsible for its agents' acts and agreements that are within the agent's authority, whether the authority is actual or apparent." *Sherman, Taff & Bangert, P.C.*, 133 S.W.3d at 127. "There is no particular method by which an agency relationship is established. It is necessary only that the credible facts, taken as a whole, fairly disclose that a party is acting for or is representing another by the latter's authority." *Wickes Lumber Co. v. Richmond Constr.*, 690 S.W.2d 488, 490 (Mo.App. W.D.1985). "Even in the absence of actual authority, an agent's acts may be binding on the principal if performed with apparent authority." *Lynch v. Helm Plumbing & Elec. Contractors, Inc.*, 108 S.W.3d 657, 660 (Mo.App. W.D. 2002). "Apparent authority results from a direct communication from the principal to a third party causing that third party to reasonably believe that a person has authority to act for the principal." *Alexander v. Chandler*, 179 S.W.3d 385, 388 (Mo. App. W.D.2005). "The communication need not be verbal and can constitute a combination of actions by the principal, or manifestations that the principal allows to be made without objection." *Id.*

> When a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform a particular act on behalf of his principal, the principal is estopped, as against such innocent third person, from denying the agent's authority to perform the act.

*Hamilton Hauling, Inc. v. GAF Corp.*, 719 S.W.2d 841, 846 (Mo.App. W.D.1986). "Once established, apparent authority is the equivalent of expressly conferred authority as far as third persons are concerned." *Utley Lumber Co. v. Bank of the Bootheel*, 810 S.W.2d 610, 613 (Mo.App. S.D.1991).

To establish the apparent authority of a purported agent, Motorsport must show that

(1) the principal manifested his consent to the exercise of such authority or knowingly permitted the agent to assume the exercise of such authority; (2) the person relying on this exercise of authority knew of the facts and, acting in good faith, had reason to believe, and actually believed, the agent possessed such authority; and (3) the person relying on the appearance of authority changed his position and will be injured or suffer loss if the transaction executed by the agent does not bind the principal.

*Link v. Kroenke*, 909 S.W.2d 740, 745 (Mo. App. W.D.1995). "Any reliance by the third party must be reasonable." *Lynch*, 108 S.W.3d at 660. In a true apparent agency, "the principal appoints the agent, either expressly or by implication, by conduct for which the principal is responsible." *Rizzo Motors, Inc. v. Cent. Bank of Kansas City*, 825 S.W.2d 354, 358 (Mo. App. W.D.1992). "This appointment 'may be by notice or reasonable basis of suspicion of the agent's acts with knowing acquiescence by the alleged principal.'" *Id.* (quoting *Springfield Television, Inc. v. Gary*, 628 S.W.2d 398, 402–03 (Mo.App. S.D.1982)). "The burden of establishing the presence of an agency rests upon the party alleging the relationship's existence." *Corrington Park Assocs., L.L.C. v. Barefoot, Inc.*, 983 S.W.2d 210, 213 (Mo.App. W.D.1999).

We find that Motorsport has shown that each of the criteria for establishing Michael's apparent agency has been satisfied. First, Marsha manifested her consent to the exercise of Michael's authority or knowingly permitted Michael to assume the exercise of such authority

by leaving the ownership section of the credit application blank. In doing so, Marsha knowingly permitted Michael to exercise apparent authority to act on behalf of Wiedmaier, Inc. The credit application constituted a direct communication from Wiedmaier, Inc. (through Marsha) to Motorsport causing Motorsport to reasonably believe that Michael had authority to act for Wiedmaier, Inc.

Second, Motorsport, relying on Michael's exercise of authority and acting in good faith, had reason to believe, and actually believed, that Michael possessed such authority. Motorsport received a credit application from Wiedmaier, Inc. signed by owner Marsha Wiedmaier, listing Michael as an owner. Motorsport had no reason to believe that Michael was not an owner of Motorsport or was otherwise unauthorized to act on Wiedmaier, Inc.'s behalf.

Wiedmaier, Inc. argues that even if Motorsport's reliance on Michael's apparent authority was reasonably prudent on April 10, 2003, when Michael submitted the credit application, such reliance could not have been and was not reasonably prudent from and after June 23, 2003. At that time, Michael personally made the first payment on the account with a check drawn on the account of Extreme Diecast. At that time, Lyndsay Sims, as instructed by Michael, changed the billing address of the account from Wiedmaier, Inc.'s place of business to Michael's home address and referenced Extreme Diecast on shipping documents and billing invoices. The name of the account was ultimately changed to Extreme Diecast as of the October 3, 2003, billing. All of the principal players at Motorsport were aware of the existence of Extreme Diecast and Michael's partner in that company, Steve Darrah, and all knew that product was being shipped and sold to Extreme Diecast and that beginning on June 23, 2003, all monies paid on the sub-

ject account were submitted by Michael on checks drawn on the account of Extreme Diecast. Therefore, Wiedmaier, Inc. argues, after June 23, 2003, Motorsport's officers and employees had no reasonable basis to believe that Michael was the agent of Wiedmaier, Inc. with authority to purchase merchandise from Motorsport on credit. At the very least, Wiedmaier, Inc. argues, Motorsport had "red flags waving all around it suggesting that Michael was something other than the agent of Wiedmaier, Inc." Wiedmaier, Inc. argues that after June 23, 2003, Motorsport, in order to reasonably protect its business interest, had a duty to further investigate Michael's authority with Wiedmaier, Inc., which it failed to do.

We find that this argument is without merit. James testified that it is a common practice for a truck stop to have a separate division with a separate name to handle its diecast and other related merchandise, and that Michael represented that this is exactly what Extreme Diecast was. James, Sims, and Rainey all testified that it was represented to them that Extreme Diecast was under the "umbrella" of or "part of" Wiedmaier, Inc. Sims also testified that it is common to "drop ship" merchandise to addresses other than a company's billing address. Last, James testified that she was under the impression that Wiedmaier, Inc. intended to expand its business into Ohio. This evidence explains what Wiedmaier, Inc. characterizes as "red flags" concerning Michael's authority to act on behalf of Wiedmaier, Inc., and negates any alleged duty on Motorsport's part to investigate Michael's authority.

Third, Motorsport changed its position and will be injured or suffer loss if the transaction executed by Michael does not bind Wiedmaier, Inc. Motorsport extended credit to Wiedmaier, Inc. based on its interaction with Michael and based on its

belief that it was dealing with Wiedmaier, Inc. Marsha Wiedmaier has refused to pay the account balance. If the transaction executed by Michael does not bind Wiedmaier, Inc., Motorsport will suffer the loss of the balance due on the account.

Wiedmaier, Inc. compares the present case to *Shelby v. Slepekis,* 687 S.W.2d 231 (Mo.App. W.D.1985). In that case, John Slepekis, a Commerce Bank vice-president, approved and arranged a real estate loan to Marvin Shelby, a longtime Commerce Bank customer, acting for the bank. *Slepekis,* 687 S.W.2d at 233. However, the real estate transaction fell through. *Id.* Slepekis then proposed to Shelby that Shelby go ahead and obtain the loan and in turn loan the proceeds to Slepekis with the understanding that Slepekis would repay Shelby in ninety days and Shelby could then repay the bank. *Id.* Shelby agreed and also complied with Slepekis's request to keep their arrangement confidential. *Id.* at 234. No one at Commerce Bank, other than Slepekis, knew that Slepekis was the recipient of the proceeds of the Shelby loan. *Id.* Slepekis subsequently refused to pay Shelby, and Shelby brought an action against Commerce Bank and Slepekis, a bank vice-president, alleging joint liability for fraud committed by Slepekis. *Id.* Shelby contended that Commerce was jointly liable for the fraud because Slepekis acted in the transaction as an agent for the bank. *Id.* Specifically, Shelby contended the bank caused Slepekis to be placed in a position of authority to make loans and thereby perpetrate the fraud and that Slepekis had the authority of an implied agent by reason of his activities on behalf of the bank. *Id.* This court concluded that the evidence did not show Slepekis to be the agent of the bank in the transaction with Shelby under any concept of agency.[2] *Id.* Concerning apparent agency, we determined that Shelby had no ground to believe that Slepekis had authority from the bank to negotiate loans to bank customers and appropriate the funds himself. *Id.* at 235. To the contrary, we found, Shelby had actual knowledge that the bank did not and would not approve Slepekis's personal ventures with the loan funds. *Id.* We also noted that Shelby was himself a party to concealing from the bank the fact that Slepekis was the actual beneficiary of a loan intended to finance Shelby's real estate purchase. *Id.* We found that Shelby did not in good faith deal with Slepekis under any belief that Slepekis was acting for the bank as to the personal loan which Slepekis solicited, but instead, Shelby fully understood the transaction to be one arranged by and for Slepekis individually. *Id.*

We find the present case distinguishable from *Shelby.* In *Shelby,* the plaintiff had actual knowledge that the bank did not and would not approve of the transaction, and Shelby was actually a party to the concealment of the transaction from the bank. Shelby did not act with a good faith belief that Slepekis was acting for the bank in conducting the transaction, but rather, he fully understood that the transaction was arranged by and for Slepekis individually. By contrast, in the case at bar, Motorsport did not have actual knowledge of Wiedmaier, Inc.'s disapproval of Michael's transaction with Motorsport, nor did it participate in any attempt to conceal the transaction from Wiedmaier, Inc. Rather, Motorsport acted with a reason-

---

**2.** As noted in *Shelby,* 687 S.W.2d at 235, this determination and the accompanying discussion of the merits are relegated to dicta due to the court's finding that the trial court's judgment was not a final appealable judgment and, thus, it had no jurisdiction to consider the appeal.

able, good faith belief that Michael was acting as an agent for Wiedmaier, Inc.

Thus, because we find that Motorsport has met all the elements for establishing that Michael was the apparent agent of Wiedmaier, Inc., we conclude that the trial court did not err in entering judgment in favor of Motorsport and against Wiedmaier, Inc. and Marsha Wiedmaier.

In accordance with Western District Special Rule XXIX,[3] Motorsport has filed a motion requesting attorneys' fees and expenses incurred in connection with this appeal in the amount of $7,820.88. The credit application signed by Marsha provides as follows:

> In the event this account becomes delinquent and is turned over to any collection agency or attorney for collection, I agree to pay collection fees and/or attorney fees not exceeding 30% of the past due balance plus court costs, serving costs, and/or any other miscellaneous expenses incurred as a result of my failure to pay.

The past due balance, as found by the trial court, is $93,388.58. The trial court awarded $13,406.38 in prejudgment interest through May 30, 2005. The trial court also awarded Motorsport attorneys' fees and expenses in the amount of $25,165.93, $24,341.18 of which was attorneys' fees and $824.75 was expenses.

Motorsport contends that it has incurred $13,732.50 in fees since the entry of the trial court's judgment, but that in view of the parties' contractual limit on fee recovery to 30% of the past-due balance, its recovery of fees is limited to $32,038.49, or 30% of the principal and interest awarded below. Motorsport requests that this

court award it the difference between this amount and the fee award below, or $7,697.31 of the fees it has incurred on appeal, together with its out-of-pocket disbursements since trial in the amount of $123.57, for a total of $7,820.88. However, the contractual agreement provides that the attorney fees may not exceed 30% of the past due balance. Contrary to Motorsport's contention, this does not include the prejudgment interest awarded by the trial court. Thus, the award of attorneys' fees is limited to $28,016.57, or 30% of the principal of the past-due balance. The difference between $28,016.57 and the $24,341.18 in attorneys' fees awarded below is $3,675.39. We award Motorsport $3,675.39 in attorneys' fees, plus $123.57 for out-of-pocket disbursements since trial, for a total award of $3,798.96.

## Conclusion

We hold that the judgment of the trial court should be affirmed. The evidence supports the trial court's determination that Michael acted as an apparent agent of Wiedmaier, Inc. in its dealings with Motorsport. The evidence also supports Marsha's individual liability as guarantor of the Wiedmaier, Inc. account. Motorsport's motion for award of attorneys' fees and expenses is granted.

The judgment of the trial court is affirmed.

HOLLIGER and HARDWICK, JJ., concur.

---

**3.** This rule provides that "[a]ny party claiming an amount due for attorney's fees on appeal pursuant to contract, statute or otherwise and which this Court has jurisdiction to consider, must file a separate written motion before submission of the cause. This shall not apply to claims for damages under Rule 55.03 or Rule 84.19."