275 S.W.3d 329 (2008)
CITIZENS FOR GROUND WATER PROTECTION, a Missouri Non-Profit Corporation, Gary Rogers, Carol Alberty, Harry Coambes, Susan Tolliver, Rancel Clark, and Ronnie Williams, Plaintiffs-Appellants,
v.
William Larry PORTER and Linda Jo Porter, husband and wife, Robert Porter and Mary Porter, husband and wife, Jeff Porter, and Gulfstream Bioflex Energy, L.L.C., a Missouri Limited Corporation, a/k/a Gulfstream Biolfex Industries, Defendants-Respondents.
Nos. SD 28732, SD 28797.
Missouri Court of Appeals, Southern District, Division Two.
December 9, 2008.
Motion for Rehearing and Transfer Denied December 29, 2008.
Application for Transfer Denied February 24, 2009.
*332 William H. McDonald, William H. McDonald & Associates, Springfield, MO, for Appellants.
Craig F. Lowther and Kory D. Stubblefield, Lowther Johnson, Attorneys at Law, L.L.C., Springfield, MO, for Respondents.
GARY W. LYNCH, Chief Judge.

Overview
Plaintiffs filed a petition in the Circuit Court of Webster County seeking injunctive and declaratory judgment relief against Defendants relating to Defendants' proposed use of a parcel of land in Webster County for construction of an ethanol plant and the alleged unreasonable use of groundwater from that land for the manufacture of ethanol. Plaintiffs initially sought and obtained a temporary restraining order from the trial court, secured by their posting of a $25,000 injunction bond, enjoining Defendants from pursuing their plans until a trial on the merits of Plaintiffs' petition was held. After that trial, the court entered a judgment denying Appellants any relief and ordered the release of the injunction bond. Both sides timely appealed this judgment.
Plaintiffs initiated this action based upon their allegation that Defendants' proposed use of groundwater to manufacture ethanol, both as to draw from the ground and discharge after use, was unreasonable because it would harm Plaintiffs. They claimed that Defendants' proposed draw of water would unreasonably affect their ability to draw water from their land and that the Defendants' proposed discharge of water *333 would either trespass on or otherwise pollute their land.
The trial court's resolution of these allegations involved consideration of extensive technical scientific evidence concerning the construction of the proposed ethanol plant, the proposed draw of groundwater to be used in the ethanol manufacturing process and the discharge and disposal of wastewater as a by-product of the manufacturing process, as well as the impact of such draw and discharge upon the land and environment surrounding the proposed plant both on the surface and below the surface of the earth. In resolving conflicts in this evidence, the trial court was called upon to exercise its judgment in deciding the relative credibility of the witnesses. In other words, in order to determine the facts upon which to apply the law to reach a decision in this case, the trial court was required to believe some evidence presented by some witnesses to the exclusion of other conflicting evidence.
As a court of review, our function in these appeals is not to second guess the trial court's witness-credibility determinations or to invade the province of the trial court's function as the fact-finder, but rather, is limited to a determination as to whether the trial court committed any legal errors in reaching its decision. Moreover, our review is further limited to only those alleged legal errors raised by an appealing party. In resolving an alleged legal error, we determine the applicable and appropriate legal principle and then apply that law to the facts as determined by the trial court to reach the result as mandated by that law, regardless of any public or media interest or any of our own personal wishes, opinions, or beliefs.
Our decision in this case is limited to resolving the legal disputes between the parties in this case based upon the evidence in the record before us which was generated specifically during and for this case and which is related to the particular circumstances between these parties. Thus, regional, state, or national public policy issues and debates as to the efficacy of ethanol, the propriety of land-use planning, or the conservation of our natural resources are beyond the scope of our appellate function and inquiry and are rightfully left to appropriate legislative bodies and executive agencies for consideration and determination.
In their appeal, Plaintiffs raise four points of alleged trial court error challenging the trial court's denial of any relief, and Defendants raise one point related to the release of the bond. Finding no legal error in the trial court's denial of relief to Plaintiffs as posited in Plaintiffs' points, we affirm that determination. However, finding the trial court legally erred in ordering the release of the injunction bond, as alleged in Defendants' point on appeal, we reverse the judgment as to such release and remand the case to the trial court to strike from the judgment the language releasing the bond.
The resolution of the claims of legal error as raised by the parties in their cross-appeals requires a thorough and, unfortunately for the reader, lengthy recitation and review of the factual and procedural background of this case.

Factual and Procedural Background
In August 2006, Gulfstream Bioflex Energy, L.L.C. ("Gulfstream") contracted with William Larry Porter, Linda Jo Porter, Robert Porter, Mary Porter, and Jeff Porter ("Porters"), property owners of adjacent tracts of land in Webster County, for options to purchase a total of 252 acres for the purpose of constructing and operating an ethanol manufacturing plant. The contracts were contingent upon Gulfstream obtaining necessary governmental approvals *334 and permits and test drilling to ensure that sufficient water was available to satisfy the needs for such an operation.
The site was selected for its access to highway and rail transportation, in order to provide ease of transportation of corn and the finished product, and its close proximity to a natural gas pipeline. There is a convenience store, a baseball park, and a used-car lot situated east of the site. Situated directly west of the site is an automotive junkyard, west of which is an industrial park. The property north of the site is used predominately for agricultural purposes, including cattle and horse operations. The surrounding area is sparsely populated.
Gulfstream announced its intent to invest $165 million dollars to construct its plant in late August 2006. In order to evaluate the suitability of the site for the plant's proposed operations, Gulfstream first required the drilling of a test well in order to measure the volume of water available and determine the water's characteristics. Once suitability was determined, Gulfstream anticipated drilling multiple wells to a depth of approximately 1,600 feet, cased to a depth of approximately 650 feet, to meet the need for the maximum capacity that the plant would require, estimated at 945 gallons of water per minute. Gulfstream also began the process of obtaining some thirty-seven permits and approvals at federal, state, and municipal levels in order to comply with applicable regulations.
Webster County has no planning and zoning ordinances. The Webster County Commission ordered the formation of a committee, the Webster County Groundwater Impact Committee, to investigate any possible impact of the proposed plant on the environment and report its findings. The Committee's report was issued on September 8, 2006.
Citizens for Ground Water Protection ("Citizens"), a non-profit corporation incorporated on September 22, 2006, filed a petition for preliminary and permanent injunction on October 2, 2006, against the Porters and Gulfstream (collectively, "Defendants"), opposing the test drilling and construction of the ethanol manufacturing plant. On October 5, 2006, Citizens petitioned for a temporary restraining order seeking to enjoin Gulfstream from any drilling activities for fifteen days. Citizens claimed that the report issued by the Webster County Groundwater Impact Committee concluded that use of the wells necessary in the operation of the ethanol manufacturing plant would result in "immediate and irreparable injury, loss and/or damage to Plaintiff and its members[.]"
The Circuit Court of Webster County issued a temporary restraining order ("TRO") filed October 5, 2006, enjoining Gulfstream "from drilling a deep well on the Porter property for fifteen days[,]" set bond amount at $25,000, and set a hearing date for October 18, 2006, on Citizens' request for a preliminary injunction. On October 13, 2006, Citizens deposited $25,000 cash with the circuit clerk, and the trial court entered an order approving that deposit as satisfying the bond requirement in the TRO. Defendants opposed Citizens' request for injunctive relief on the ground that Citizens lacked standing to bring suit.
On October 17, 2006, Citizens filed a motion for extension of the TRO and Defendants moved for a change of judge. Defendants' motion for change of judge was sustained, and the preliminary hearing was postponed until a new judge could be appointed. The TRO expired by its express terms on October 18, 2006. A new judge was assigned on October 19, 2006.
Defendants filed a motion to dismiss Citizens' petition on November 2, 2006. *335 Citizens filed its first amended petition on November 6, 2006, adding plaintiffs Gary Rogers, Carol Alberty, Harry Coambes, Susan Tolliver, Rancel Clark, and Ronnie Williams, directors of Citizens and Webster County residents who claimed an interest in property "and ground water ... beneath, adjacent, abutting, adjoining and/or near" the Porters' property (Citizens and these additional plaintiffs are collectively referred to herein as "Plaintiffs"). Plaintiffs objected to the placement of the plant at its planned site, alleging future nuisance, trespass, and negligence. Plaintiffs requested a temporary injunction and sought to have a preliminary injunction made permanent.
In Count I, they alleged, in part, that the "deep wells, by cone of depression and/or cone of influence and/or draw down, will directly and/or proximately deplete, injure and/or destroy the aquifer of several city wells of Marshfield, Rogersville, Fordland and others, all damaging and injuring the general health, safety and welfare" of residents situated in the affected areas around Gulfstream's proposed plant. Further, that by locating the plant "at or near the `Ozark Divide[,]'" the discharge of water from the plant, "either by surface water drainage and/or runoff, and/or ground water flow," would affect the White, Gasconade, and/or James Rivers, to the detriment of the safety and general health and welfare of Plaintiffs and others similarly situated. Plaintiffs also alleged that certain geological and hydro geological anomalies common in the area, i.e., sinkholes, karst topography and fault systems, "may provide direct and/or near direct access to material deep aquifers that serve" those situated near the proposed site. The results, Plaintiffs claimed, would be that their groundwater would be diminished, with wells lowered, dried, or destroyed, and that aquifers would be damaged or polluted, thereby polluting their drinking water.
In Count II, Plaintiffs requested a declaratory judgment, alleging, in part, that they had "a legally protected pecuniary and/or personal interest not only in their groundwater a/k/a percolating water and the characteristics attendant thereto on and/or beneath their land, but also to the ground water a/k/a percolating water and the characteristics attendant thereto on and/or beneath the lands of defendants and those similarly situated."
Defendants filed their Answer on January 3, 2007, denying most of Plaintiffs' allegations. In answer to Count II, defendants alleged that "ownership and/or interest in the ground water is determined by Missouri law," and contended that Plaintiffs' claims of any greater interest should be denied.
Meanwhile, on December 12, 2006, the parties appeared for a hearing on Plaintiffs' motion to either extend the previously issued TRO or for the issuance of a new TRO. Drilling of one test well had already been completed, and the well had been cased and capped. Two days after this hearing, the trial court entered an order which provided, in part:
Because the Motion to Extend was not heard on or before October 18, 2006, by reason of the disqualification of the assigned judge, this court treats the Temporary Restraining Order as remaining in effect, and is ruling the issue as to whether it should be extended or not.
From the testimony adduced at hearing on December 12, 2006, it appears that one deep well, twelve inches in diameter, has been drilled, cased, and capped. While three additional wells are proposed, no action has been taken to drill same.

*336 IT IS THEREFORE ORDERED, that the Temporary Restraining Order shall remain in full force and effect as to the drilling of any additional wells pending this cause being heard on the merits. It is further ordered that the Bond previously posted shall remain in full force and effect pending trial on the merits. The court notes that a hearing could be held as to the issuance of a preliminary injunction, but that the parties have consented to an expedited hearing on the merits, with the trial on same set for March 6, 2007.
At the bench trial held on March 6 and 7, 2007, the parties agreed that evidence taken at the December 12, 2006 hearing would be considered as evidence at trial. Both parties requested findings of facts and conclusions of law. The trial court identified two major issues for resolution. First, "will the construction of an ethanol plant and the withdrawal of water from the Ozark Aquifer result in a loss of water that will jeopardize other wells and water use in Webster County." Second, whether there will "be a discharge of water from such a plant that will damage plaintiffs and nearby property and the use of such property."

Substantive Facts
We base our presentation of the substantive facts in this case upon the trial court's extensive findings and credibility determinations, viewing the evidence and reasonable inferences in a light most favorable to the result reached, as we must. See Harrison v. DeHeus, 230 S.W.3d 68, 74 (Mo.App.2007). In doing so, we have freely incorporated the trial court's findings and conclusions without any further attribution.
Engineers Carter & Burgess, Inc., an engineering firm with 3,400 employees nationwide, will design and incorporate all of the latest technology and design specifications in order for Gulfstream's proposed plant to operate as efficiently and unobtrusively as possible. Once in operation, the ethanol manufacturing plan will have the capacity to produce approximately 88 million gallons of ethanol per year. Although there is no evidence that the plant will operate at maximum capacity on a continuous basis, in order to achieve maximum capacity, the plant will require 945 gallons of water per minute. This amount includes the water needed to produce the ethanol, as well as the water necessary for the plant's cooling towers.
To ensure this quantity of water would be obtainable, it would be necessary to construct a test well on site that would penetrate deep into what is known as the Ozark Aquifer. James Vandike testified on behalf of Defendants. He is a licensed geologist and the chief of Missouri's Department of Natural Resources ("DNR") Groundwater Section, serving in that capacity for eleven years at the time of his testimony. Vandike has also published multiple authoritative studies related to the Ozark Aquifer and groundwater issues in this state. The trial court specifically found Vandike's testimony and publications admitted into evidence to be informative, unbiased, authoritative, and credible and noted that other expert witnesses testified that they relied upon Vandike's publications and considered them authoritative.
High-yield wells are wells capable of producing seventy gallons of water or more per minute. In order to drill a high-yield well, notification prior to drilling is required so that state geologists with DNR may determine and set the casing depth required for the well. This casing seals a well from outside influences above the level of casing and protects groundwater quality. DNR also evaluates data to determine *337 if the water supply at a particular site will sufficiently yield the water needed and will forewarn well drillers if it has information that the desired yield may fall short of expectations. Prior to drilling the test well, Gulfstream complied with the notification requirements. In a letter to Gulfstream dated October 5, 2006, DNR geologist Matt Parker notified Gulfstream that a minimum casing of 643 feet was required for the proposed test well. Vandike concurred with this determination. There was no warning to Gulfstream in Parker's letter that anticipated yields might fall short of expectations.
In October 2006, Gulfstream contracted with Harper Drilling Company to drill the test well. Clint Harper is the owner of the drilling company and is highly experienced in drilling high-yield wells, having drilled many throughout the nearby locale. The test well was drilled to 1,600 feet deep and cased to a depth of 643 feet, as required by DNR. Gulfstream requested a test pump[1] after completion, and Harper performed two such tests. The first test, performed November 8, 2006, pumped 725 gallons per minute, and the second test, on November 16, 2006, pumped 904 gallons per minute. During both test pumps, Harper monitored the tests from a shallower well about 1,500 feet away, and recorded zero drawdown[2] of the water table. At the completion of these tests, the static water level at the well head quickly recovered to its prior level within a matter of hours.
Charles Harper, Clint's brother and also a registered geologist, was consulted regarding the well tests, and testified that the quick recovery of the water level and a zero drawdown of the water table indicate there is no "influence out of the deep aquifer on the shallow aquifer." Following testing, Clint Harper completed and submitted the readings from his two test pumps on a "High Yield Well Data Form" as DNR requires. DNR found nothing inappropriate with the drilling and test pumps at the well drilled for Gulfstream.

Consequences of Defendants' Proposed Draw of Water
According to Vandike, among others, water supplied from a well drilled on the proposed site would be extracted from what is known as the Potosi Dolomite formation of the Ozark Aquifer, which Vandike described as "the highest yielding bedrock aquifer in southern Missouri." Many community public water systems and other high-yield wells are supplied through this source. The Ozark Aquifer contains an estimated 450 trillion gallons of water, supplying water for nearly all of southern Missouri. It extends from south of the Missouri River into northern Arkansas, west into southeastern Kansas and northeastern Oklahoma, and east into western Illinois.
In one of his publications, Vandike calculated the quantity of stored groundwater *338 for each county in Missouri and concluded that aquifers in Webster County, including the Ozark Aquifer, contain more than 12.25 trillion gallons of stored water, representing the sixth-highest amount of stored water of the 114 counties in this state. Vandike believes that the volume of available groundwater in Missouri, estimated to be slightly more than 500 trillion gallons of usable quality groundwater, "is so staggering that it is difficult to imagine how such a resource could ever be depleted." The trial court concluded that Webster County has a more than sufficient water supply to satisfy the demands of the proposed ethanol plant.
Hundreds of high-yield wells extract water from the Ozark Aquifer, including 206 wells which yield more than 300 gallons per minute in Webster, Phelps, Greene, Laclede, Lawrence, and Barry Counties. The yields of wells fully penetrating the Ozark Aquifer typically average 1,000 gallons per minute in the Springfield and Webster County areas. Several commercial high-yield wells are situated within a twenty-mile radius of the proposed site.
According to DNR, Webster County uses less than one billion gallons of water per year, one of the lowest water usage rates in the state. One reason for its lower rate of water usage is the county's low population; Webster County has only 33,000 to 34,000 residents. Another reason is that Webster County has relatively few major water users.
There was further testimony regarding the effect of the proposed plant's water usage on the individual wells of surrounding neighbors. The evidence was consistent that a drawdown will occur around Gulfstream's wells, as with any domestic well, as that is a result of pumping. However, when the pumping stops, "the recovery is normally a mirror image of the original drawdown."
How much drawdown might be expected to occur was debated. Dr. Tom Aley, Plaintiffs' expert, admitted he did not know, although he testified that this volume of water withdrawn from the Ozark Aquifer would lead to significant lowering of the water table and would affect the wells of nearby landowners. However, Aley did opine that Gulfstream's extraction of water from the lower Potosi formation would have no impact on Marshfield's city well. Defendants' experts, Dr. John Van Brahana and Dr. Jeffrey Cawlfield, testified that there would be no appreciable effect on neighboring wells. Under "worst case" conditions, the effect would be a "de minimus drawdown" of five feet or less within 5,000 feet of the proposed plant site, and that estimate assumes it never rains again in Webster County. This estimated drawdown is less than anticipated seasonal fluctuations.
Dr. Jeffrey Cawlfield is a professor and geological engineer at the University of Missouri-Rolla who teaches classes in geological engineering, subsurface hydrology, and environmental risks. According to Dr. Cawlfield, the Potosi formation of the Ozark Aquifer is very high yielding. It also has a very high rate of "transmissivity," which indicates how rapidly and easily water moves through a system. The lower one drills in the Potosi formation, the higher the transmissivity level.
Further, all formations within an aquifer receive "recharge" from the movement of water in all directionslaterally (horizontal movement) and vertically (from rainfall, for example). A majority of the recharge in the Potosi formation is lateral. According to a 1989 report authored by hydrogeologist Jeff Imes and admitted into evidence, about forty percent of the water taken from the Ozark Aquifer is supplied by lateral flow. These two factorsthe high rate of transmissivity and the large *339 amounts of lateral rechargeconvinced Dr. Cawlfield, to a reasonable degree of scientific certainty, that Gulfstream's extraction of water at the proposed site would not have a significant impact on the upper and shallower wells of Plaintiffs or their neighbors. The greater a distance a neighboring well is located from the site, the more the impact would be reduced.
Dr. John Van Brahana is a professor of geology at the University of Arkansas, whose specialty is in groundwater hydrogeology. He was formerly employed for twenty-nine years by the United States Geological Survey ("U.S.G.S.") as a research hydrologist and has performed groundwater flow modeling since 1975. He presently maintains his affiliation with the U.S.G.S. as a scientist emeritus. Dr. Brahana is widely published in the fields of geology, hydrology, hydrogeology, and the relationship of groundwater flow to aquifers. He concurred with Vandike's assessment that there were 12 trillion gallons of stored water in Webster County. An analysis of the test pumps performed by the drilling company led Dr. Brahana to conclude, consistent with Vandike's conclusion, that there is a huge amount of water available in the Potosi formation for high-yield well usage.
Likening the groundwater in the Ozark Aquifer to a river or a stream, in that it is constantly moving, Dr. Brahana testified that the Ozark Aquifer contains a "very large amount" of water which is "under dynamic recharge." In analyzing "recharge," Dr. Brahana explained that it is not scientifically reliable to look only at the vertical movement of groundwater; that one must also look at the lateral movement, plus "water that may be stored in the aquifer."
Dr. Brahana prepared a groundwater model of the proposed plant's water usage after analyzing and incorporating into his model a variety of data relating to the Potosi formation's transmissivity, permeability, and conductivity, including data from Vandike's studies, authoritative reports and the test pumps. Groundwater models provide an appropriate and reliable evaluation of the impact of the pumping of a well and are based, in part, on the characteristics of the geology of a particular site. In the case of the proposed site's access to the Potosi formation, because it is not a "true karst aquifer," it is conducive to groundwater modeling.
In incorporating data from the various sources in his modeling, Dr. Brahana sought to "provide the worst-case scenario." To accomplish this, he used lower transmissivity values than those provided by Vandike and other experts, and he also assumed that it would never rain again in Webster County, i.e., that there would be no vertical recharge in the groundwater at the proposed site. The results obtained by Dr. Brahana indicate that after one year of continuous pumping at 945 gallons per minute (315 gallons per minute at three wells), a drawdown of five feet was estimated at distances of 3,500 to 5,000 feet from the proposed site. The drawdown would be even less at distances beyond 5,000 feet. Furthermore, the drawdown resulting after ten years of continuous pumping (at 945 gallons per minute) was also estimated at five feet, although the drawdown area would extend farther out. Based upon these "worst-case scenarios," Dr. Brahana concluded that the operation of the proposed plant would produce a very small drawdown in the upper sections of the Ozark Aquifer and it would not be an unreasonable use of groundwater to operate the ethanol manufacturing plant at the proposed site.
Plaintiffs offered testimony from Citizens' corporate representative that Citizens has no specific data to demonstrate *340 that operation of the proposed plant will result in the depletion of neighboring wells. Ms. Alberty, a plaintiff and neighboring landowner, testified that she had no personal knowledge of the same.
Tom Aley, who holds a B.S. and M.S. in forestry and is a registered geologist and professional hydrogeologist and has practiced in the field of hydrology and hydrogeology since 1964, testified that operation of the proposed plant would result in a significant lowering of the water table, which would affect wells of some of the nearby landowners within a two-mile radius of the plant. Mr. Aley did not believe that there would be any "appreciable recharge" of the aquifer. He further testified that the safe yield for a three-acre tract of property in Webster County would be 86.4 gallons per day, which is the "the average amount of water used by one individual[.]" It was his opinion that every house built in Webster County where more than one individual resided would violate his minimum safe yield calculation and further deplete the groundwater supply. The trial court found that acceptance of this opinion as true would condemn any further development in Webster County, which the court was not inclined to do.
However, Aley limited his recharge analysis to only vertical recharge resulting from rainfall at the site; he did not take into account any lateral recharge in his analysis. Although Aley agreed with opinions expressed that Webster County has one of the highest stored groundwater mounds in the state, in his analysis, he ignored the amount of stored groundwater, which contributes to any scientific recharge analysis. According to Vandike, Webster County has more than 12 trillion gallons of water in storage, enough to supply the proposed plant's needs for more than 24,000 years. In addition, Aley's testimony that a groundwater divide located near the proposed site acts to limit the amount of lateral recharge was contradicted by Vandike's testimony that this divide does not act as a barrier.
The trial court found Mr. Aley's opinion that neighboring wells would be affected was based on nothing more than his own beliefs and speculation, in that Aley never inspected the site or any of Plaintiffs' wells, never tested Plaintiffs' wells, and never tested the Ozark Aquifer or the test well at the proposed site. Furthermore, Aley provided no estimates regarding the anticipated drawdowns of the aquifer, nor did he perform groundwater modeling of the potential effects of the operation of the proposed plant. The trial court found that, given the various omissions from Aley's analysis, it could not reasonably rely on his opinions.
Elizabeth Warrick, a registered geologist, also testified on behalf of Plaintiffs. Although she testified that the Potosi Dolomite formation is a good source of water, she believed, as did Aley, that withdrawal of water from the Ozark Aquifer would lead to significant lowering of the water table and would in turn affect the wells of some of the plaintiffs and nearby landowners. Warrick further indicated that she had never tested or inspected the proposed site or any individual plaintiff's well, and she never performed any groundwater modeling of the potential effects of the operation of the proposed plant. For these reasons, the trial court did not find her opinions credible.
The trial court found that Plaintiffs offered no credible scientific evidence of the amount of anticipated drawdown that would be caused within the cone of depression or whether it would cause harm to the other wells in the area. The trial court found credible the testimony and scientific calculations of Vandike, Dr. Cawlfield, and Dr. Brahana, "as well as the exhibits displaying *341 the abundance of water in the Ozark Aquifer in Webster County." Accordingly, the trial court concluded that the operation of the proposed ethanol manufacturing plant will have little, if any, impact on the individual Plaintiffs and their neighbors' water supply.

Consequences of Defendants' Proposed Discharge of Water
There was evidence that as a consequence of the manufacture of ethanol, the plant would produce wastewater which, although substantially biodegradable, would have to be treated before it could be discharged. Raymond D. Hamilton, a professional engineer with thirty-three years' experience and the practice area leader for water and wastewater treatment for Carter & Burgess, Inc., is certified as a specialist in the field of water and wastewater treatment by the American Academy of Environmental Engineers and has worked on some of the largest wastewater treatment plants in the country. It will be Hamilton's responsibility to design the wastewater treatment and water discharge mechanisms for the ethanol manufacturing plant, and he will act as the engineer of record for the project's wastewater discharge.
After inspecting the proposed site and reviewing the plans, Hamilton estimated that the plant would discharge 411,075 gallons of wastewater per day. To determine whether any of the wastewater would be discharged off site, Hamilton inspected the site and calculated the site's "mass balance," which is essentially determined by evaluating the amount of water applied to a location versus the amount of water lost from that location during a given time period. The first factor to consider in the calculation is the permeability of the soil, which Hamilton conservatively estimated at only .01 inches per hour. Next, Hamilton analyzed the area's evapotranspiration rate employing the Penman equation, which is generally accepted in the irrigation industry (as opposed to the Thornthwaite method used by Mr. Aley, which is not generally accepted nor endorsed). Finally, Hamilton incorporated a mean average annual rainfall for the site of 47 inches. This, too, was a conservative estimate, given that the area's average rainfall is actually closer to 40 inches per year. Applying these conservative estimates, Hamilton concluded, with a reasonable degree of scientific and engineering certainty, the plant would operate as a "no discharge" facility.
There are two ways to design a no-discharge facility for this site. First, Hamilton could design a combination of a 75-acre land application system and a storage lagoon. As the site is 252 acres, Hamilton would have more than sufficient room for this system, which would allow for as much as 600,000 to 700,000 gallons of water flow per day, significantly more than the expected flow of 411,075 gallons per day. Alternatively, if the permeability of the soil is less than .01 inches per hour, Hamilton would remove the low-permeability soil and replace it with soil with a much higher permeability. Then he could design a system requiring only 12 acres for a land application system. Hamilton testified that the water leaving the plant, although applied to and contained on site, will be treated in a manner that it will not contain any contaminants or pollution in excess of the allowable amounts, based upon all applicable water quality regulations and requirements, including Missouri's Clean Water Law.
On the issue of possible impact from water discharge from the proposed plant, Plaintiffs relied on testimony from Tom Aley. Although he offered his opinion that discharge from the plant would damage Plaintiffs' and nearby properties, the trial *342 court noted that Aley did not visit or inspect the site and had never designed a wastewater discharge facility for industrial use.
Elizabeth Warrick testified regarding the quality of the water discharged from the proposed plant, stating that there are regulations and monitoring requirements that will be imposed on Gulfstream in the operation of its proposed plant. Some of these regulations and requirements relate to the quality of the water that could be discharged from the plant. While she opined that discharged water from the facility would damage Plaintiffs' and nearby properties, she further admitted that she had never designed an industrial discharge facility for an industrial water user, and she gave no indication that the plant would in any way violate the regulations and requirements she cited.
The trial court found credible Hamilton's testimony on the issue related to dangers posed from discharged water at the site. The trial court noted Hamilton's experience as a water treatment and discharge engineer and the fact that Hamilton inspected the site and employed accepted scientific and engineering principles, "neither of which was done by Mr. Aley." Specifically, the trial court found "that Plaintiffs have presented no credible evidence that the proposed ethanol plant will fail to comply with water quality regulations and requirements for the State of Missouri."

Trial Court Judgment
Finding that Plaintiffs failed to carry their burden to establish and prove claims for nuisance, trespass, negligence per se, strict liability, and absolute liability, the trial court entered judgment for Defendants on both counts in Plaintiffs' petition and ordered "[b]ond of $25,000.00 discharged and same ordered returned to Plaintiffs." Plaintiffs appeal, challenging the trial court's denial of any relief on their petition, and Defendants appeal, challenging the trial court's release of the bond.

Plaintiffs' Appeal  Number 28732
In their appeal, Plaintiffs bring four points: (1) this court is without statutory authority to hear this appeal because the judgment is not a final judgment as is required by section 512.020; (2) the trial court erred in finding that Defendants' proposed use of groundwater, both as to draw and discharge, was reasonable; (3) the trial court erred in denying injunctive relief by holding Plaintiffs to a "certainly and inevitably" burden of proof instead of a "reasonably certain" or "reasonably likely" burden of proof as Plaintiffs claim is required by law; and, (4) the trial court erred in admitting into evidence the well test results performed by Clint Harper. For ease of analysis, we will address Plaintiffs' fourth point out of order by considering it after our discussion of their first point and before our discussion of their second and third points.

Plaintiffs' Point I  Statutory Authority to Hear Appeal
Plaintiffs' first point asserts that we lack statutory authority to hear this appeal because the trial court's judgment is not a final judgment as required by section 512.020(5),[3] "in that the trial court did not *343 rule on Plaintiffs' Count II for Declaratory Judgment and the issues raised therein[.]"
"Absent one of the exceptions expressly set out in [s]ection 512.020, an aggrieved party may only appeal from a final judgment of the trial court." Lake Osage Condo. Ass'n, Inc. v. Prewitt, 179 S.W.3d 331, 335 (Mo.App.2005) (quoting Hampton v. King Royal Bros. Circus, 140 S.W.3d 257, 259 (Mo.App.2004)). "A final, appealable judgment disposes of all parties and all issues in the case, leaving nothing for further determination." Albright v. Kelley, 926 S.W.2d 207, 209 (Mo.App.1996).
In the instant case, the issues before the trial court were asserted in and framed by Plaintiffs' first amended petition which was brought in two counts: count one seeking injunctive relief and count two seeking a declaratory judgment. All of the named plaintiffs directed both counts against all of the named defendants. No counterclaims were asserted by any of the defendants. The trial court's judgment, which satisfies all Rule 74.01 requirements for a judgment, states: "Based on findings and conclusions set forth above, court enters Judgment in favor of Defendants and against Plaintiffs on Count I and Count II of Plaintiffs' First Amended Petition." As such, the trial court's judgment was a final judgment for purposes of section 512.020(5), because it disposed of all parties and all issues in the case and left nothing for further determination. Albright, 926 S.W.2d at 209.
Nevertheless, even in spite of the trial court's very explicit language in its judgment disposing of Count II, Plaintiffs argue that the judgment is not final because the trial court failed to rule on the issue of "whether or not [Defendants'] proposed use of ground water would be a reasonable use both as to draw and discharge."[4] While this alleged failure may constitute a legal error by the trial court, which would be reviewable on appeal, it does not negate the fact that the trial court implicitly disposed of the issue by entering judgment in favor of Defendants and against Plaintiffs on Count II. Such a disposition of the issue was sufficient for the purpose of entering a final judgment, as required by section 512.020(5), and supporting our statutory authority under that section to hear this appeal. Point I is denied.

Plaintiffs' Point IV  Admission of Harper Well Tests into Evidence
Plaintiffs' fourth point claims the trial court erred by admitting into evidence Defendants' *344 Exhibit 38  the deep well test results made by Clint Harper on the Porter farm on November 8 and 16, 2006. This claim was not properly preserved for our appellate review. After (1) stipulating to its admissibility, (2) offering this exhibit into evidence themselves, (3) twice affirmatively stating "no objection" when Defendants offered it into evidence, and (4) further stipulating and representing to the court after trial that this exhibit had been admitted into evidence without objection, Plaintiffs have waived and failed to properly preserve for appellate review any alleged error in the admission of this exhibit into evidence.
"To preserve for appellate review an error regarding the admission of evidence, a timely objection must be made when the evidence is introduced at trial. If the objection is not made at the time of the incident giving rise to the objection, the objection may be deemed waived or abandoned." R & J Rhodes, L.L.C. v. Finney, 231 S.W.3d 183, 190 (Mo.App. 2007) (quoting Letz v. Turbomeca Engine Corp., 975 S.W.2d 155, 168 (Mo.App.1997) (internal citations omitted)). "The general rule in Missouri is that a statement of `no objection' when the evidence is introduced affirmatively waives appellate review of the admission." State v. Oglesby, 103 S.W.3d 890, 891 (Mo.App.2003) (citing State v. Starr, 492 S.W.2d 795, 801 (Mo. banc 1973)). "When evidence of one of the issues in the case is admitted without objection, the party against whom it is offered waives any objection to the evidence, and it may be properly considered even if the evidence would have been excluded upon a proper objection." Sherrod v. Dir. of Revenue, 937 S.W.2d 751, 753 (Mo.App. 1997). "Relevant evidence received without objection may properly be considered." Jerry Bennett Masonry, Inc. v. Crossland Constr. Co., Inc., 171 S.W.3d 81, 99 (Mo. App.2005).
In order to accommodate the travel schedule of one of Plaintiffs' witnesses, which witness Plaintiffs also expected to testify in rebuttal to one of Defendants' witnesses who was anticipated to testify as to the significance of the well tests, the parties agreed to take Plaintiffs' witness's rebuttal testimony as an offer of proof with the understanding that if the Defendants later called their anticipated witness regarding the significance of the well tests, then the trial court would consider the offer of proof of Plaintiffs' rebuttal witness as evidence in the case. During this offer of proof, the following dialogue occurred (emphasis added):
A. [Plaintiffs' counsel to Court] ... defendants performed what they're calling well tests. And they have provided those documents to us, and we've stipulated those are going into the record. There's not going to be any dispute about that.
* * *
Q. (By [Plaintiffs' Counsel]) Sir, do you or do you not have criticisms of the purported tests, well tests that were conducted by Bioflex?
A. Yes, sir.
[DEFENDANTS' COUNSEL]: May I make an objection? Why don't we go ahead and offer the tests, if he has a critique of it?
[PLAINTIFFS' COUNSEL]: Sure.
[DEFENDANTS' COUNSEL]: It's Exhibit 38....
* * *
[DEFENDANTS' COUNSEL]: This is Plaintiff's [sic] Exhibit 38, which is the test.... Here you go, [Plaintiffs' counsel]. Here's one for you.
[PLAINTIFFS' COUNSEL]: Thanks.

*345 Q. (By [Plaintiffs' counsel]) Thirty-eight, that's the well test.
A. All right.
[PLAINTIFFS' COUNSEL]: Now, even though it's in the offer of proof, basically, we've stipulated and agreed that this can come into evidence. So 
[DEFENDANTS' COUNSEL]: Yes.
[PLAINTIFFS' COUNSEL]:  we offer 38.

[DEFENDANTS' COUNSEL]: No objection.
THE COURT: Exhibit 38 of the defendant is offered by the plaintiff and received by the Court as a part of the offer of proof.
After the conclusion of this offer of proof by Plaintiffs and later that afternoon, while Defendants were conducting their direct examination of their anticipated witness regarding the significance of the well tests, the following transpired (emphasis added):
[DEFENDANTS' COUNSEL]: Your Honor, I'd offer Defendants' Exhibit 29. It's an authenticated copy of the Department of Natural Resources regulations of the water discharge. And I'd also reoffer Exhibit 38, which is the pump test, which I think we offered in the offer of proof.
[PLAINTIFFS' COUNSEL]: No objection.

THE COURT: Let me get, first of all, 29?
[DEFENDANTS' COUNSEL]: Yes, your Honor.
THE COURT: And that's the DNR regulations?
[DEFENDANTS' COUNSEL]: For water discharge.
THE COURT: Admitted.
THE COURT: What's the other exhibit?
[DEFENDANTS' COUNSEL]: Thirty-eight, which is the well test, which I think we offered in the offer of proof, but I want to make sure I offer it in the regular case.
THE COURT: Any objection?
[PLAINTIFFS' COUNSEL]: No objections. The record should note that that is both well tests in one exhibit.
THE COURT: Exhibit 38 is admitted.
At the conclusion of the trial, the court expressed some concern about the identification of all the exhibits that had been offered and admitted into evidence. This was due to the fact that the parties had stipulated that the evidence taken at some pre-trial hearings concerning the issuance of a temporary restraining order should be admitted and considered by the trial court, along with the evidence taken at trial, in deciding the merits of Plaintiffs' first amended petition. The trial court instructed the parties' trial counsels to:
[S]it down and agree on what has been offered and admitted and you each will submit to me a list on those things that you agree on and those that you don't and we're not going to close the evidence at this point, which means this is off. We're back to get the evidence straightened out, and once you get it straightened out, then I'll start the clock.
Pursuant to this instruction, the parties thereafter filed a "Joint Stipulation Regarding Exhibits[,]" in which they stated and represented to the trial court that "Exhibit B, attached hereto, is a copy of defendants' updated Exhibit List. There is no dispute with regard to any of the exhibits identified on Exhibit B." (Emphasis added). This Exhibit B indicates Defendants' Exhibit 38  Porter Property High Yield Well Data Form  as being "A w/o *346 O[,]" signifying admitted without objection. (Emphasis added).
Nevertheless, Plaintiffs claim in their reply brief that: "to assert that [Plaintiffs] waived their objections is false, baseless and contrary to specific agreements. [Plaintiffs] did not offer the test did not then waive their objections, and did not later waive their objections." Moreover, Plaintiffs' counsel during oral argument before this court specifically and categorically denied that Plaintiffs' trial counsel announced "no objection" when Exhibit 38 was offered into evidence in the trial court. Yet, the record clearly refutes each one of Plaintiffs' denials. In addition, Plaintiffs have failed to cite this court to any agreements in the record supporting their assertion that their apparent waiver of any objections to Exhibit 38, as indicated in the record as quoted previously, is "contrary to specific agreements."
Based upon the record before this court, Plaintiffs explicitly waived and failed to preserve for appellate review any alleged trial court error in admitting Defendants' Exhibit 38 into evidence by initially stipulating to its admission, offering it into evidence themselves, stating "no objection" when Defendants offered it into evidence, and representing to the trial court after trial that it had been admitted into evidence without objection. Point IV is denied.

Plaintiffs' Point II  Reasonable Use
As best we can glean from Plaintiffs' second point,[5] they are challenging the trial court's denial of relief either by injunction or declaratory judgment because such denial could only be supported by the trial court's determination that Defendants' proposed use of groundwater was reasonable. Plaintiffs argue that a reasonable use determination by the trial court was contrary to the holding in Higday v. Nickolaus, 469 S.W.2d 859 (Mo.App.1971), because Defendants' proposed use is excessive, not for the use of the "land from *347 which it was taken," mined for sale or use and disposal off the Porter farm, and will pollute or contaminate the surface and groundwater of those who adjoin or are in proximity to the Porter farm. In addition to misapplying the law as stated in Higday, Plaintiffs also contend that the trial court's determination that Defendants' proposed use was reasonable was not supported by substantial evidence, was against the weight of the evidence and erroneously declared the law.

Standard of Review[6]
An action seeking an injunction is an action in equity. Systematic Business Services, Inc. v. Bratten, 162 S.W.3d 41, 46 (Mo.App.2005). "The standard of review in a court-tried action in equity is that of a judge tried case: the trial court's judgment will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or unless it erroneously applies the law." Id. (citing Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976); L.B. v. State Comm. of Psychologists, 912 S.W.2d 611, 616 (Mo.App. 1995)). Likewise, "[w]hen reviewing an action for a declaratory judgment, our standard of review is the same as in any other court tried case." Harrison, 230 S.W.3d at 74 (citing Beavers v. Recreation Ass'n of Lake Shore Estates, Inc., 130 S.W.3d 702, 708 (Mo.App.2004)).
We accept as true the evidence and reasonable inferences therefrom in favor of the prevailing party and disregard the contrary evidence. This Court should defer to the trial court in judging the credibility of witnesses and resolving conflicting evidence. Great deference is given to a trial court on factual issues because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record. An appellate court defers to the trial court when there is conflicting evidence, even if there is evidence which would support a different conclusion.
Harrison, 230 S.W.3d at 74 (internal citations and quotations omitted). Moreover, in reviewing fact issues, the credibility of witnesses and the weight given to their testimony is a matter for the trial court, which is free to believe none, part or all of such testimony. Herbert v. Harl, 757 S.W.2d 585, 587 (Mo. banc 1988).

Discussion
Plaintiffs bore the burden of proving their allegation that Defendants' proposed use of groundwater was unreasonable. Sur-Gro Fin., Inc. v. Smith, 755 S.W.2d 439, 442 (Mo.App.1988). In their effort to do so, they called two expert witnesses: Dr. Tom Aley and Elizabeth Warrick. In response, Defendants presented the testimony of their expert witnesses, Dr. John van Brahana, Raymond Hamilton, James Vandike, and Dr. Jeffrey Cawfield. Generally, Plaintiffs' experts testified that Defendants' proposed use, both as to draw and discharge, would have an unreasonable impact upon Plaintiffs, while Defendants' experts testified that Defendants' proposed use, both draw and discharge, would have very little, if any, *348 impact upon Plaintiffs, and that, therefore, the proposed use was reasonable. Someone had to make the decision as to which witnesses to believe, and under our legal system that function is assigned to the trial court. Harrison, 230 S.W.3d at 74.
After making many specific findings as to evidence presented by Defendants' expert witnesses, the trial court concluded:
Based on the testimony and scientific calculations of Mr. Vandike, Dr. Cawlfield [sic] and Dr. Brahana, as well as the exhibits displaying the abundance of water in the Ozark Aquifer in Webster County, the Court finds that the operation of [Defendants'] proposed ethanol plant will have little, if any, impact on the [Plaintiffs] and their neighbors' water supplies.
Having made this finding as to Defendants' proposed use in drawing water, the trial court turned to Defendants' discharge of the water so drawn and found the testimony of Mr. Hamilton, another of Defendant's expert witnesses, to be credible that "[Defendants'] proposed ethanol plant can be operated as a `no discharge' facility." The trial court went on to state: "Mr. Hamilton, a highly experienced engineer, testified that water leaving the plant  even though applied to and contained on the Rogersville Site  will be treated through an on-site facility. This facility will treat the water in a manner that it will not contain any contaminants or pollution in excess of the allowable amounts."
Conversely, the trial court made very detailed and specific findings regarding the lack of credibility of Plaintiffs' expert witnesses on both of these issues. The trial court believed very little, if any, of their testimony. This lack of credible evidence doomed Plaintiffs in carrying their burden of proving that the Defendants' proposed use of their land for an ethanol plant would be unreasonable.
Plaintiffs apparently claim in their point relied on that these trial court findings are not supported by substantial evidence and are against the weight of the evidence. Plaintiffs, however, failed in their point relied on to explain in a summary fashion why, in the context of this case, the stated legal reasons support the claims of reversible error as required by Rule 84.04(d)(1)(C), see note 5 supra. Moreover, Plaintiffs fail to even mention, much less develop, either of these claimed errors in the argument section of their brief. "An argument must explain why, in the context of the case, the law supports the claim of reversible error. It should advise the appellate court how principles of law and the facts of the case interact." In re Marriage of Fritz, 243 S.W.3d 484, 487 (Mo.App.2007). A claim of legal error in a point relied on which is not supported by any argument is considered abandoned. Id. Plaintiffs' failure to provide the factual context of these alleged errors in either their point relied on or their argument leave this court with nothing more than Plaintiffs' bare assertions of legal error. In this vacuum, any effort by this court to address these claimed legal errors would require us to act as an advocate for Plaintiffs by scouring the record for factual support of these claims. This we cannot and will not do. See Bishop v. Metro Restoration Servs., Inc., 209 S.W.3d 43, 45 (Mo.App.2006). We have no choice other than to deem these claimed legal errors abandoned.
Likewise, Plaintiffs have completely failed to develop their contention under this point that the trial court erroneously declared the law. Other than a very brief reference to the trial court's reliance on Aufderheide v. Polar Wave Ice & Fuel, 319 Mo. 337, 4 S.W.2d 776 (1928), in the last sentence of their argument on this point, which is specifically addressed by Plaintiffs *349 in their third point, Plaintiffs direct us to no other declaration of law made by the trial court which they claim is in error under this point. Without such guidance, we have no choice other than to deem this contention abandoned. Fritz, 243 S.W.3d at 487.
Finally under this point, we turn to Plaintiffs' claim that the trial court erred by erroneously applying the law. Plaintiffs claim that the applicable law governing their right to injunctive relief and a declaratory judgment is found in Higday and that the trial court failed to follow Higday in four respects: Defendants' proposed use of groundwater will (1) be excessive, (2) not be for the use of the "land from which it was taken," (3) be mined for sale or use and disposal off the Porter farm, and (4) pollute or contaminate the surface and groundwater of those who adjoin or are in proximity to the Porter farm.
The first and fourth contentions  Defendants' proposed use will be excessive and will pollute or contaminate the surface and groundwater  challenge the factual determinations as to draw and discharge made by the trial court. Such findings are relevant to the alleged erroneous application of law only if they are not supported by substantial evidence or are against the weight of the evidence, both claims of which have been abandoned by Plaintiffs as previously explained infra.
The resolution of Plaintiffs' second and third contentions  Defendants' proposed use will not be for the use of the land from which it was taken and will be mined for sale or use and disposal off the Porter farm  require a closer look at Higday. In that case, the plaintiffs owned several thousands of acres of land overlying an alluvial water basin in Boone County known as the McBaine Bottom. Higday, 469 S.W.2d at 861. The City of Columbia purchased 17.25 acres located outside of its city limits but over the McBaine Bottom, threatening to "extract groundwater at the rate of 11.5 million gallons daily for purposes wholly unrelated to any beneficial use of the overlying land, but instead, [intending] to transport the water to its corporate boundaries some miles away for the purposes of sale." Id. at 862. The plaintiffs filed a petition against the City for declaratory judgment and an injunction, which the trial court dismissed in response to the City's motion to dismiss alleging the petition failed to plead either a justiciable controversy or any claim upon which relief could be granted. Id. at 861. In the trial and on appeal, the City took the position that Missouri followed the common law rule[7] "that a landowner has absolute ownership to the waters under his land and, therefore, may without liability withdraw any quantity of water for any purpose even though the result is to drain all water from beneath his neighbors' land." Id. at 863. The Higday court rejected the common law rule in favor of the rule of reasonable use. Id. at 869. This rule was articulated by the court as follows:
As it applies to percolating groundwater, the rule of reasonable use recognizes that the overlying owner has a proprietary interest in the water under his lands, but his incidents of ownership are restricted. It recognizes that the nature of the property right is usufructuary rather than absolute as under the English rule. Under the rule of reasonable use, the overlying owner may use the subjacent groundwater freely, and without liability to an adjoining owner, but only if his use is for purposes incident to *350 the beneficial enjoyment of the land from which the water was taken. This rule does not prevent the consumption of such groundwater for agriculture, manufacturing, irrigation, mining or any purpose by which a landowner might legitimately use and enjoy his land, even though in doing so he may divert or drain the groundwater of his neighbor.
Id. at 866 (emphasis added). While acknowledging that "[the] principal difficulty in the application of the reasonable use doctrine is in determining what constitutes a reasonable use[,]" the court further noted that, nevertheless:
[An] overlying owner, including a municipality, may not withdraw percolating water and transport it for sale or other use away from the land from which it was taken if the result is to impair the supply of an adjoining landowner to his injury. Such a use is unreasonable because non-beneficial and `is not for a' lawful purpose within the general rule concerning percolating waters, but constitutes an actionable wrong for which damages are recoverable."
Id. (emphasis added).
As previously stated, Plaintiffs contend that the trial court erred in not applying the reasonable-use rule as announced in Higday in the instant case in two respects: Defendants' proposed use will not be for the use of the land from which is was taken and will be mined for sale or use and disposal off the Porter farm. On the first contention, Plaintiffs' argument consists of one paragraph which provides:
Mr. Larry Porter made it crystal clear in his testimony ... that the well [Gulfstream] drilled was 1) not one the Porters would have drilled; 2) was not for any use on the Porter farm; 3) they had no plans for it if GBE could not use it; 4) there was no pump in the well; and 5) after drilling GBE had capped the well.
Apparently, Plaintiffs are arguing that because the Porter farm was currently being used for agricultural purposes, groundwater could be taken from the land, pursuant to the "but only" caveat to the Higday reasonable-use rule, only if it was used for agricultural purposes. Plaintiffs interpret the rule much too narrowly and totally ignore the sentence following that caveat which states: "This rule does not prevent the consumption of such groundwater for agriculture, manufacturing, irrigation, mining or any purpose by which a landowner might legitimately use and enjoy his land, even though in doing so he may divert or drain the groundwater of his neighbor." Higday, 469 S.W.2d at 866 (emphasis added). Defendants sought to beneficially enjoy the Porter farm by building on it a plant which would manufacture ethanol. Apart from the taking of groundwater, Plaintiffs do not otherwise suggest that Defendants have no legal right to beneficially enjoy the use of their land for manufacturing, including the manufacture of ethanol. Rather, Plaintiffs sought a declaratory judgment that "Defendants' use and announced and/or intended use of their lands and groundwater a/k/a percolating water and its attendant characteristics is an unreasonable use of same now and in the future." Higday does not per se prohibit the taking of groundwater from land for manufacturing on that land. The issue in Higday is whether such taking is reasonable. In the instant case, the trial court found this issue adversely to Plaintiffs, both as to draw and discharge, because Plaintiffs failed to prove Defendants' proposed use was unreasonable.
Plaintiffs' second contention related to the reasonable-use rule in Higday is that groundwater will be mined for sale or use and disposal off the Porter farm. Plaintiffs' *351 argument in support of this contention also consists of only one paragraph:
[Defendants] acknowledged variously that approximately 25% of the ground water drawn would be bound up in the ethanol product and shipped to "Atlanta" and the "East Coast." The remainder would be discharged as waste water. Setting aside excessive use and pollution, this is in direct violation of Higday's, supra, reasonable use doctrine which specifically prohibits sale and arguably injurious disposal.
As best we can discern from this argument, Plaintiffs are claiming that the reasonable-use rule adopted in Higday prohibits the sale of groundwater taken from the land and that the trial court erred in not applying that prohibition to the facts in the instant case because some of the groundwater drawn from the land will be bound into the ethanol which will be shipped away from the property and presumably sold. This argument fails for two reasons.
First, as previously discussed, the reasonable-use rule in Higday specifically provides for and allows the reasonable taking of groundwater from the land for manufacturing that takes place on that land. Nothing in Higday suggests that because the manufactured product leaves the land with some amount of groundwater bound in it that such use is per se unreasonable.
Second, even if the sale of ethanol was considered the sale of groundwater because it has some amount of groundwater bound in it, Higday's reasonable-use rule prohibits such sale only "if the adjoining landowner is thereby deprived of water necessary for the beneficial enjoyment of his land." Higday, 469 S.W.2d at 870. In the case at bar, the trial court found that Defendants' proposed use of groundwater, both as to draw and discharge, would have little, if any, impact on Plaintiffs.
In conclusion, Plaintiffs' failure to carry their burden of proving Defendants' intended use of groundwater was unreasonable, as analyzed and discussed above, precludes any application of the reasonable-use rule as enunciated in Higday. Finding no trial court error under Higday, Plaintiffs' Point II is denied.

Plaintiffs' Point III  Burden of Proof for Injunction
Plaintiffs initially contend in their third point that the trial court erred in denying them injunctive relief because it misapplied the law in holding them to the "certainly and inevitably" burden of proof as set forth in Aufderheide, infra, and Nothaus v. City of Salem, 585 S.W.2d 244 (Mo.App. 1979), rather than the lower "reasonably certain" or "reasonably likely" burden of proof, as set forth in Lee v. Rolla Speedway, Inc., 494 S.W.2d 349 (Mo. 1973) and Lee v. Rolla Speedway, Inc., 539 S.W.2d 627 (Mo.App.1976). We need not, and do not, decide this issue or any of Plaintiffs' additional arguments as to why the "certainly and inevitably" standard is inappropriate because the trial court's factual findings support a denial of injunctive relief to Plaintiffs even under the lower standard for which they advocate.
As noted previously, the trial court made specific findings of fact that Defendants' proposed draw of groundwater would have "little, if any, impact on [Plaintiffs] and their neighbors' water supplies." Likewise, the trial court found that there would be no discharge of water from the plant onto adjoining lands and that the discharge of water on Defendants' own property would not contain any "contaminants or pollution in excess of the allowable amounts." Based upon these findings, Plaintiffs failed to show any harm to them was either reasonably certain or reasonably *352 likely to occur as a result of either Defendants' proposed draw or discharge of groundwater. As such, Plaintiffs failed to meet even the lower burden of proof which they argue the trial court should have applied. Plaintiffs' Point III is denied.

Defendants' Appeal  Number 28797
Defendants' sole point asserts that the trial court misapplied the law in releasing the $25,000 TRO bond because the release of the bond in the judgment occurred at the same time that Defendants' cause of action on the bond for the improvident issuance of the TRO first accrued, thereby depriving Defendants the opportunity to assert such a claim. We agree.
On review of a trial court's judgment on an injunction bond, we will affirm the trial court "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." Petrol Props., Inc. v. Stewart Title Co., 225 S.W.3d 448, 456-57 (Mo.App.2007) (quoting Dent Wizard of San Francisco, Inc. v. Bunetic, 172 S.W.3d 481, 483 (Mo.App. 2005)).
"At common law there was no liability incurred by a plaintiff who in good faith obtained an injunction; Missouri follows this rule except where an injunction bond is posted by rule or statute." State ex rel. Shannon County v. Chilton, 626 S.W.2d 426, 430 (Mo.App.1981). Rule 92.02(d) requires, in pertinent part:
No ... temporary restraining order... shall issue in any case ... until plaintiff ... shall have executed a bond... conditioned that the plaintiff will abide by the decision that shall be made thereon and pay all sums of money, damages and costs that shall be adjudged if the injunction or temporary restraining order shall be dissolved.
Rule 92.02(d). In lieu of executing such a bond, a plaintiff may deposit cash with the court to secure such amount subject to the same condition. Id., see Curtis v. Tozer, 374 S.W.2d 557, 588 (Mo.App.1964) (where a bond is given in pursuance of a statute, courts in enforcing the bond will read into it the terms of the statute). The purpose of this bond requirement is to secure "the payment of appropriate damages in the event the injunction is dissolved." Brick House Café & Pub, L.L.C. v. Callahan, 151 S.W.3d 838, 845 (Mo.App.2004).
"Liability accrues on an injunction bond, and a defendant's right of action comes into being, when the impropriety of the issuance of the injunction has been determined as a consequence of the termination of the injunction suit adversely to the party procuring the injunction." Waterman v. Waterman, 210 S.W.2d 723, 726 (Mo.App.1948) (citing Cohn v. Lehman, 93 Mo. 574, 6 S.W. 267 (1887)); Goad v. Mister Softee of the Mississippi Valley, Inc., 380 S.W.2d 493, 495 (Mo.App.1964). "A proceeding for the assessment of damages on an injunction bond is in the nature of a new, separate and independent controversy." J and P Trust v. Cont'l Plants Corp., 541 S.W.2d 22, 26 (Mo.App.1976). Such an action may be asserted either in a separate action or by motion filed in the pending case. Burney v. McLaughlin, 63 S.W.3d 223, 235-36 (Mo.App.2001).
The TRO in the instant case, as extended by the trial court following the hearing on December 12, 2006, continued in effect until the case was resolved on the merits by the entry of the trial court's judgment. This judgment, being adverse to Plaintiffs, dissolved the TRO. It was only upon this adverse determination on Plaintiffs' claim for injunctive relief that Defendants' independent action on the bond accrued. Goad, 380 S.W.2d at 495. The trial court's release of the bond in the *353 judgment denied Defendants the opportunity to assert a claim on the bond, either in a separate action or by motion in this case, and as such, the release was in error. Id.
Plaintiffs assert that Defendants have waived any claim on the bond because they failed to assert a claim in the trial court prior to judgment. They fail to support this assertion, however, with any citation to legal authority, and we can find none. Plaintiffs also direct us to their motion to release bond filed on October 27, 2006, and Defendants' failure to respond thereto, as additional support of their waiver argument. Plaintiffs ignore the fact, however, that they thereafter requested, pursued and obtained an extension of the TRO on December 12, 2006, the efficacy of which required the continued posting of the bond. Such actions clearly demonstrate that Plaintiffs abandoned their motion for release of the bond.

Decision
The trial court's judgment is reversed and remanded to the trial court with directions to strike therefrom the order that: "Bond of $25,000.00 discharged and same ordered returned to Plaintiffs." The judgment in all other respects is affirmed.
BURRELL, P.J., and RAHMEYER, J., concur.
NOTES
[1] Test pumps are common in order to determine yield capacity. Such tests aid in determining at what level the water in the well becomes stabilized. Generally, the well is pumped for a minimum of six hours; the duration is determined after three consecutive hourly readings indicate that the water level has stabilized. With Harper's tests, this well was pumped for eight hours. The well yielded 1,500 galls per minute and stabilized at 260 feet.
[2] "When a well is pumped, water level in the aquifer adjacent to the well begins to decline.... The drawdown is greatest in the pumped well and decreases with distance away from the well. This drawdown gradient extends in all directions away from the pumped well, and is roughly coned shape. The terms cone of influence, drawdown cone, cone of depression, and radius of influence are all terms which describe the same phenomena." Miller and Vandike, Groundwater Resources of Missouri, 92-93 (1997).
[3] Section 512.020, RSMo 2000 (Cum.Supp. 2004) provides:

Any party to a suit aggrieved by any judgment of any trial court in any civil cause from which an appeal is not prohibited by the constitution, nor clearly limited in special statutory proceedings, may take his or her appeal to a court having appellate jurisdiction from any:
(1) Order granting a new trial;
(2) Order refusing to revoke, modify, or change an interlocutory order appointing a receiver or receivers, or dissolving an injunction;
(3) Order granting or denying class action certification provided that:
(a) The court of appeals, in its discretion, permits such an appeal; and
(b) An appeal of such an order shall not stay proceedings in the court unless the judge or the court of appeals so orders;
(4) Interlocutory judgments in actions of partition which determine the rights of the parties; or
(5) Final judgment in the case or from any special order after final judgment in the cause; but a failure to appeal from any action or decision of the court before final judgment shall not prejudice the right of the party so failing to have the action of the trial court reviewed on an appeal taken from the final judgment in the case.
[4] Plaintiffs also assert that such failure "breached the trial court's duty under Rules 73.01 and 87.01 and constitutes a denial of due process, equal protection, access to (open) courts and a certain remedy under U.S. Const. Amend. 14 and Mo. Const. Article I, §§ 2, 10 & 14." Plaintiffs fail, however, to explain how any of these alleged legal errors deprive this court of statutory authority under section 512.020.5 to hear and decide this appeal.
[5] Plaintiffs' second point provides:

In the alternative the trial court erred in apparently and/or implicitly finding that Appellees' proposed use of ground water was reasonable (both drawing and discharge) and not unreasonable, which is in direct conflict with the holding of the Western District in Higday, supra, and the law of Missouri because Appellees' proposed use of ground water is (A) excessive, (B) not for the use of the "land from which it was taken," (C) mined for sale and/or use and disposal off the porter farm, and (D) will pollute and/or contaminate the surface and ground water of those who adjoin and/or are in proximity to the Porter farm and such holding of reasonable use and not unreasonable use if such there be is erroneous because it is (1) not supported by substantial evidence that such use is or will be reasonable, rather the evidence shows such use as [sic] unreasonable; (2) against the weight of the evidence; and (3) such holding if such there be erroneously declares the law and/or erroneously (4) applies the law.
Defendants urge this court to dismiss Plaintiffs' second point because it fails to comply with Rule 84.04(d)(1). Other than generally claiming compliance with this rule, Plaintiffs did not otherwise address these alleged deficiencies in their reply brief. This point does not identify the ruling of the trial court being challenged, as required by Rule 84.04(d)(1)(A), and does not explain in a summary fashion why, in the context of this case, the stated legal reasons support the claim of reversible error as required by Rule 84.04(d)(1)(C). See, e.g., Nelson v. Nelson, 195 S.W.3d 502, 514 (Mo.App.2006). Nevertheless, it is always this court's desire and preference to address a point on its merits where we can discern the argument being made and can address it without becoming an advocate for the appellant or placing an opposing party at a disadvantage. See Hines v. Smith, 172 S.W.3d 437, 439 n. 4 (Mo.App. 2005). In such a situation, we may exercise our discretion, as we do here, to decide the point on its apparent merits. Lediner v. Harris, 145 S.W.3d 479, 483 (Mo.App.2004).
[6] Plaintiffs failed to state the applicable standard of review under this point in their argument as required by Rule 84.04(e). "The standard of review is an essential portion of all appellate arguments; it outlines this court's role in disposing of the matter before us." Waller v. Shippey, 251 S.W.3d 403, 406 (Mo.App.2008). Noncompliance with this rule justifies dismissal of the point. Id. We will, nevertheless, exercise our discretion to reach the merits of the point.
[7] This rule is also sometimes referred to as the "English common law rule" or the "English rule." Higday, 469 S.W.2d at 865.