**UTLEY LUMBER COMPANY, a Corporation, Plaintiff–Respondent,**

v.

**BANK OF THE BOOTHEEL, a Banking Corporation, Defendant–Appellant.**

No. 17118.

Missouri Court of Appeals, Southern District, Division One.

May 1, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 22, 1991.

Application to Transfer Denied July 23, 1991.

James E. Reeves, Ward & Reeves, Caruthersville, for plaintiff-respondent.

Wendell W. Crow, Crow, Reynolds & Preyer, Kennett, for defendant-appellant.

PREWITT, Judge.

Plaintiff had a checking account with defendant. Using plaintiff's checks drawn on and payable to defendant to purchase money orders from defendant, plaintiff's bookkeeper improperly used $97,754.05 from plaintiff's account for her benefit.

Plaintiff alleged "defendant, wrongfully converted, misapplied and misappropriated checks and funds of plaintiff". At the conclusion of all the evidence, the trial court sustained plaintiff's motion for directed verdict, and entered judgment for plaintiff of $97,754.05, with interest making the judgment total $117,118.61. Defendant appeals, contending that the trial court erred in directing the verdict against it and in failing to direct a verdict in its favor or in not entering judgment notwithstanding the verdict for it.

■ A plaintiff is entitled to a directed verdict when its claim is established as a matter of law with no factual questions remaining for a jury to determine and the defendant fails to establish any affirmative defenses. *Bank of Brookfield–Purdin*

*N.A. v. Burns,* 724 S.W.2d 262, 264 (Mo. App.1986).

In determining if defendant was entitled to a directed verdict, it must be decided if plaintiff made a submissible case. In so determining, this court "must view the evidence in a light most favorable to the plaintiff, giving him the benefit of all reasonable inferences to be drawn therefrom." *Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546, 551 (Mo.App.1983).

Little of the evidence is in dispute. Plaintiff is a corporation engaged in the trucking business, operating vehicles in twenty-two states, with its principal office in Steele, Missouri. Ninety–Five percent of its stock is owned by Kelley Joe Rhodes and five percent owned by his two sons, Riley Rhodes and Kelley Joe Rhodes, Jr. Kelley Joe Rhodes and Riley Rhodes are officers of the plaintiff. For over twenty years, plaintiff has been doing its primary banking business with defendant.

Barbara Overturf was hired by plaintiff as its bookkeeper in the summer of 1985. She handled bookkeeping not only for plaintiff, but other business interests of the Rhodes family. Overturf's predecessors as bookkeepers had basically the same duties. Besides general bookkeeping duties, Overturf would take plaintiff's checks, signed by Kelley Joe Rhodes or Riley Rhodes, made out to the bank as payee, to purchase money orders, to pay federal withholding taxes and repay loans. Overturf had no authority to sign checks. There were no communications between defendant and the Rhodes or other officers or personnel of plaintiff regarding the authority of Overturf or her predecessor bookkeepers to purchase money orders.

The money orders acquired were "Personal Money Orders" issued in blank except for the amount. They were used to pay plaintiff's taxes, costs, fines, and other expenses, often to governmental entities. At the bank, Overturf would sometimes explain to the teller the money orders were for speeding tickets or licenses. Overturf would receive the money orders with the payee blank and sign her name as remitter. The money order before being issued con-

sists of three pages with carbon paper between the pages. After the amount of the money order is imprinted, the bank teller would tear out and retain in the bank's records the middle copy which has the heading "Register Copy of Personal Money Order." The customer would receive the top copy and the third page, a pink sheet. The pink copy is noted as the purchaser's copy and includes the following statement:

The customer procuring the Personal Money Order form, corresponding in number and amount to that shown hereon, agrees to insert thereon in ink, the date, payee, his signature and address and assumes responsibility for all events made possible by his failure to do so.

The record indicates that during her employment Overturf purchased 137 money orders from defendant with plaintiff's checks, totaling $77,304.13, which were used to pay legitimate business debts of plaintiff. The first was purchased September 6, 1985. From August 15, 1986 to February 15, 1989, some of the checks the Rhodes signed were used by her to purchase money orders to pay her debts. Overturf would often prepare and bring checks to Kelley Joe Rhodes or Riley Rhodes to sign, when they were on the telephone, or very busy. Following this plan, Overturf was able to acquire $97,754.05 from plaintiff's bank account. Her scheme was discovered in February 1989.

During the period this occurred, plaintiff was one of defendant's largest depositors, depositing approximately six million dollars with defendant. Plaintiff had an annual payroll to truckers of between five hundred and six hundred thousand dollars, and deposited payroll tax deposits for withholding during this period with defendant of $289,866.32. During this time plaintiff made payment on loans from defendant of $364,800.53. Plaintiff and the Rhodes family had seven checking accounts with defendant.

■ Plaintiff asserts that when a depositor makes a check payable to a bank, the depositor orders the bank to handle or control the disposition of the proceeds of that check. It contends there is an obligation or a duty of the bank to insure the depositor's money is properly applied and the obligation or duty was breached here. See, e.g., *Wright v. Mechanics Bank of St. Joseph*, 466 S.W.2d 174, 176 (Mo.App.1971). 9 C.J.S. Banks and Banking § 340, p. 683 (1938), summarizes the rule on which plaintiff relies:

*Checks payable to a bank.* Where a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer, it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the authority of the drawer's agent to receive payment. [footnotes omitted]

*Wright* states that if a bank has knowledge a check payable to it is being improperly used for the personal benefit of the one in possession, then the bank is put upon inquiry and if it fails to make such inquiry, it pays the check at its peril. 466 S.W.2d at 176. *Wright* relied on and quotes extensively from *Federal Savings & Loan Ins. Corp. v. Kearney Trust Co.*, 151 F.2d 720 (8th Cir.1945).

■ Defendant contends it properly sold and issued the money orders in blank as Overturf had actual or apparent authority from plaintiff to purchase them in that manner. Apparent authority can be created by "position" and by "prior acts". *Hamilton Hauling, Inc. v. GAF Corp.*, 719 S.W.2d 841, 847 (Mo.App.1986). It is created by position if a principal puts an agent into, or knowingly permits the agent to occupy a position in which according to the ordinary habits of persons in the locality, trade or profession, it is usual for that agent to have a particular kind of authority. *Id.*

■ Whether that occurred here is not necessary to decide, as the authorized prior acts of Overturf showed at least apparent authority. A principal allowing an agent to carry out prior similar transactions may create an appearance of authority of the agent to carry out such acts. *Id.* at 848. *See also M.D. and Assoc. v. Sears, Roe-*

*buck & Co.*, 749 S.W.2d 454, 456 (Mo.App. 1988). "Acquiescence by the principal in a series of acts by the agent indicates authorization to perform similar acts in the future." *Sooter v. Magic Lantern, Inc.*, 771 S.W.2d 359, 363 (Mo.App.1989).

Once established, apparent authority is the equivalent of expressly conferred authority as far as third persons are concerned. *Eyberg v. Shah*, 773 S.W.2d 887, 891 (Mo.App.1989); *Cameron Mut. Ins. Co. v. Bouse*, 635 S.W.2d 488, 491 (Mo.App.1982). Where apparent authority exists and an innocent third party relies upon it, the principal is estopped to deny the agent's authority. *Inland USA v. Reed Stenhouse, Inc.*, 660 S.W.2d 727, 733 (Mo.App.1983).

Plaintiff says its officers did not know the bank was issuing money orders to Overturf in blank, except for the amount. Even if so, the result does not change, as they knew she was purchasing money orders. Normally, they are purchased in blank. Personal money orders are generally issued with only the amount filled out and blanks for the name of the payee, the date and the signature and address of the purchaser. H. Bailey, BRADY ON BANK CHECKS, § 1.21, p. 1–28 (6th ed. 1987).

It has been held that an issuing bank cannot on its own initiative stop payment of a personal money order. *Sequoyah State Bank v. Union National Bank*, 274 Ark. 1, 621 S.W.2d 683 (1981). It has also been said that a personal money order should be treated as a cashier's check "and not subject to countermand by either its purchaser or the issuing bank." *Interfirst Bank v. Northpark National Bank*, 671 S.W.2d 100 (Tex.App.1984). See also *State ex rel. Chan Siew Lai v. Powell*, 536 S.W.2d 14 (Mo. banc 1976) (cannot stop payment of a cashier's check); *Lovejoy v. Weese*, 689

S.W.2d 387 (Mo.App.1985) (money order negotiable instrument and payee can become holder in due course).

Other cases hold money orders are subject to stop payment orders prior to acceptance for payment. See *First Nat'l Bank of Nocona v. Duncan Savings & Loan Assn.*, 656 F.Supp. 358, 363–364 (W.D.Okla. 1987); *Newman v. First Nat'l State Bank*, 173 N.J.Super. 598, 414 A.2d 1367 (1980); *Melco Products Corp. v. Public Relations Enterprises*, 118 Misc.2d 287, 460 N.Y.S.2d 466 (1983). It is not necessary for us to consider which of these approaches is correct as there were no stop payment orders made and no facts brought to defendant's attention which would cause it to believe the money orders had an improper payee.[1]

Overturf had actual authority to go to the bank and purchase money orders. Whether she had actual authority to purchase them in blank might be questioned, but as that is the normal procedure, and was for her, through a course of dealing apparent authority was created. If Overturf did not have the authority to direct the bank as to how the proceeds of checks should be applied, then someone else connected with the plaintiff would have had to have done so. No one else did, nor is it disputed that plaintiff expected Overturf to take the checks to the bank and tell the bank how the proceeds would be used.

In two similar cases, it was recognized that there can be apparent authority to direct the application of funds from checks drawn on and payable to a bank for the purchase of cashier's checks. *Cf. Martin v. First Nat. Bank in St. Louis*, 358 Mo. 1199, 219 S.W.2d 312 (1949); *Kuraner v. Columbia Nat. Bank of Kansas City*, 230 Mo.App. 358, 90 S.W.2d 465 (1936).

Among the cases cited by respondent as well as *Wright*, are *Bullitt County Bank v. Publishers Printing Co.*, 684 S.W.2d 289 (Ky.App.1984); *Bank of So. Md. v. Robert-*

---

1. Cashier's checks are treated as cash equivalents because of their two party nature—the bank is both drawer and drawee and the payee is the second party. They are "accepted" by issuance. *State ex rel. Chan Siew Lai*, 536 S.W.2d at 16. Personal checks are three party instruments with a payee, drawer, and drawee

bank. *Id.* n. 2 Personal money orders are three party instruments as well. *Bailey*, supra § 1.21, p. 1–27. The conflict among the courts is whether to treat the personal money order as an ordinary check or a cashier's check because the bank issues it. *Id.* at 1–28.

*son's Crab House,* 39 Md.App. 707, 389 A.2d 388 (1978), and *Kaiser–Georgetown Community Health Plan v. Bankers Trust Co.,* 110 Misc.2d 320, 442 N.Y.S.2d 48 (1981). *Wright* and the other cases do not call for a different result. None of them have the course of dealing which created apparent authority that is present here. Overturf did what she had authority to do, and frequently did, purchase money orders. *Martin* and *Kuraner,* cited in the foregoing paragraph, are much closer on the facts.

Overturf had apparent, if not actual authority to purchase money orders based on the course of past dealing. She bought them in blank and what she did thereafter was out of defendant's knowledge and control. Defendant would have no way of knowing if a proper payee was inserted, unless it called plaintiff as each money order came in, an unrealistic burden. There was no evidence that defendant knew some would be paid for other than a legitimate business purpose or that an improper payee would be inserted. Nor was there any evidence anyone with defendant knew or had any suspicion of Overturf's scheme prior to its discovery.

After signing a check and allowing Overturf to have it, if one of the officers of plaintiff did not notify the bank what was to be done with it, then plaintiff's officers must have considered Overturf to have the authority to tell the bank what was to be done with the proceeds. In fact, they expected her to do so, as that was one of her duties.

Not being advised by someone else as to how the proceeds should be applied or divided nor that Overturf did not have authority, then the bank would necessarily consider she had authority to tell them the purpose or purposes of the check and purchasing money orders was a normal use of plaintiff's checks by Overturf. Defendant is not liable to plaintiff as Overturf had apparent, if not actual, authority to purchase money orders in blank.[2]

The judgment is reversed and the cause remanded. The trial court is to set aside the judgment previously entered and to enter judgment in favor of defendant, denying plaintiff's claim, with costs assessed against plaintiff.

MAUS, P.J., and CROW, J., concur.

---

2. It is unnecessary to consider the effect on these transactions of the Uniform Fiduciaries

Law, §§ 456.240–350, RSMo 1986, which defendant contends also exonerates it from liability.