PITMAN PLACE DEVELOPMENT, LLC, Appellant,

v.

HOWARD INVESTMENTS, LLC, Respondent.

No. ED 94456.

Missouri Court of Appeals, Eastern District, Division Four.

Nov. 23, 2010.

Application for Transfer to Supreme Court Denied Dec. 28, 2010.

Application for Transfer Denied March 1, 2011.

---

520

Steven M. Cockriel, Cockriel & Christofferson, LLC, St. Louis, MO, for Appellant.

Richard A. Winderlich, Anne R. Kerns, Lewis Rice & Fingersh, L.C., St. Louis, MO, for Respondent.

KURT S. ODENWALD, Presiding Judge.

## Introduction

Pitman Place Development, L.L.C. (Pitman) appeals from the judgment of the trial court finding that defendant, Howard Investments, L.L.C. (Howard), was entitled to enforce a promissory note and deed of trust against Pitman that had been executed by Matt Burghoff (Burghoff), Pitman's designated manager. Amid allegations that Burghoff wrongfully increased his authority to act on behalf of Pitman, the trial court found that Burghoff acted with apparent authority of the principal when he executed the promissory note and deed of trust. The trial court further found that, as a holder in due course, Howard was entitled to enforce the promissory note and deed of trust against Pitman. Because the trial court's ruling was supported by substantial evidence, was not against the weight of the evidence, and did not erroneously declare or apply the law, we affirm.

## Background

The following evidence, viewed in the light most favorable to the trial court's verdict, was adduced at trial:

In January 2002, Burghoff, John Sensakovic (Sensakovic), and Thomas Moore (Moore) created Pitman by executing the Pitman Place Limited Liability Company Operating Agreement (Operating Agreement). All three members made initial capital contributions and ownership was divided among the three members. According to the Operating Agreement, Pitman was organized:

A. To engage in any lawful business for which a limited liability company may be organized under the Missouri Limited Liability Company Act, including, but not limited to, buying or otherwise acquiring, owning, holding, leasing, managing and controlling real property; and

B. To acquire any and all property whether tangible or intangible, personal, real or mixed, of whatever kind, to enter into and perform contracts of any kind necessary to, in connection with, or incidental to the accomplishment of the

aforesaid purposes, and which may be in the best interests of the Company, and to borrow money and issue evidences of indebtedness and to secure the same by security interest, pledge or other lien in furtherance of the purposes of the Company.

The Operating Agreement named Burghoff as Pitman's initial manager, thereby granting Burghoff certain rights and responsibilities within the company. Burghoff's authority as manager was limited by Article 5.1 of the Operating Agreement which stated:

> The management and control of the business and affairs of the Company shall be vested exclusively in the Managers, who shall have the right and authority, singly or collectively, to manage the business and affairs of the Company and make all decisions with respect thereto, provided, however, that the following matters require, in addition, the Consent of Members:
>
> . . .
>
> (vii) to sell, assign, pledge, or encumber any property of the Company, with a
>
> (viii) value in excess of Fifty Thousand Dollars ($50,000.00); (viii) to acquire property, to contract for services, or otherwise to create any obligation or liability on the part of the Company, in excess of Fifty Thousand Dollars ($50,000.00).

Pitman's sole real estate asset was a parcel of property located in St. Louis County (the Property), which Pitman leased to a company operating a restaurant on the premises.

In July or August 2007, Burghoff met with Dan Salzman (Salzman), senior vice president of Rockwood Bank, to obtain a $525,000 loan. Burghoff proposed using the Property as collateral for the loan.

Burghoff represented to Salzman that the purpose of the loan was to refinance the Property. Although Salzman believed Burghoff had authority to sign loan documents on behalf of Pitman, Burghoff in fact acted without the consent, knowledge, or authority of Pitman's other two members.

In connection with securing the loan, Burghoff provided Rockwood Bank with a copy of the Operating Agreement. In doing so, Burghoff omitted the portion of the agreement addressing the limitations on the manager's authority to borrow. The loan processor at Rockwood Bank contacted Burghoff and informed him of the missing pages of the Operating Agreement. On the morning of the loan closing, Burghoff faxed a copy of the omitted portions to Rockwood Bank. However, Burghoff fraudulently altered Article 5.1 of the Operating Agreement to reflect an increase in the manager's authority to create "any obligation or liability" on the part of the company and "to sell, assign, pledge or encumber any property" of the company from the original $50,000 limit to $750,000. After receiving the omitted portions, the Rockwood Bank loan processor believed she had a true and accurate copy of the Operating Agreement. The loan processor testified that she never received a copy of the Operating Agreement limiting Burghoff's authority to $50,000.

The Rockwood Bank loan closed on August 24, 2007. As part of the loan closing, Burghoff, as manager of Pitman, executed a promissory note (Note) for $525,000 on behalf of, and in the name of Pitman, in favor of Rockwood Bank in exchange for a loan made by Rockwood Bank in the amount of $525,000. The Note identified the borrower as "Pitman Place Development LLC." In connection with the loan, Burghoff also executed a Deed of Trust and Security Agreement (Deed of Trust) in

the name of, and on behalf of, Pitman whereby the Property was pledged as security for payment of the Note. The Deed of Trust listed Pitman as the "grantor" and was signed by Burghoff, as "Manager of Pitman." At the loan closing, Burghoff also executed an Assignment of Leases and Rents, a UCC Financing Statement, and an Automatic Transfer Authorization, all in the name of, and on behalf of, Pitman.

A portion of the loan proceeds were used to pay Pitman's expenses and to pay off a prior lien obligation on the Property.[1] The remaining funds were deposited into Pitman's bank account. Burghoff later utilized the funds in Pitman's bank account for purposes unrelated to Pitman's business. Moore and Sensakovic had no knowledge of Burghoff's actions and did not consent or authorize Burghoff to enter into the Rockwood Bank loan transaction on behalf of Pitman.

Pitman filed suit against Rockwood Bank to set aside the Rockwood Bank loan transaction after Moore and Sensakovic discovered Burghoff's fraud. Rockwood Bank later assigned its interests in the Note and Deed of Trust to Howard, after Howard was notified of the pending litigation.

Pitman subsequently filed a four count Second Amended Petition against both Rockwood Bank and Howard on April 2, 2009. In its first count, Pitman alleged that the Rockwood Bank loan transaction was not binding and sought to quiet title to the Property, free of any purported liens or other interests claimed by Howard. Pitman asserted that the loan documents were invalid and created no enforceable interests in or against the Property. In its second count, Pitman sought a declaration that the Note was invalid as to Pitman and

that Pitman owed no money under the Note and loan documents. Pitman voluntarily dismissed its third count against Rockwood Bank prior to trial. In its fourth count, Pitman alleged an action for "Money Had and Received," against Howard.

The matter proceeded to a bench trial. The trial court entered its Findings of Fact, Conclusions of Law, Judgment and Order on January 14, 2010, denying Pitman's claims and entering judgment in favor of Howard. The trial court found that Rockwood Bank was a holder in due course of the Note and Deed of Trust, and took both instruments free of all personal and ordinary defenses. The trial court then found that under the "shelter principle," Howard was vested with the rights of the transferor, Rockwood Bank, including Rockwood Bank's rights as holder in due course. As a holder in due course, the trial court found Howard could enforce the Note and Deed of Trust against Pitman, free of all personal and ordinary defenses. The trial court also found that Burghoff was an agent of Pitman acting with apparent authority when he executed the Note and Deed of Trust. The trial court held both documents binding on Pitman.

Pitman filed a Notice of Appeal to this Court on February 19, 2010. This appeal follows.

### Points on Appeal

Pitman presents five points on appeal. In its first two points Pitman alleges that the trial court erred in finding that the Rockwood Bank loan documents were binding upon Pitman because Burghoff lacked authority to execute the loan documents. Pitman first claims that Burghoff lacked authority because executing the

---

1. The prior lien obligation was another loan entered into by Burghoff, on behalf of Pitman, without the knowledge or consent of the other two Pitman members.

loan documents was not "carrying on the usual way of the business or affairs" of Pitman, as required under Section 347.065 RSMo (2000),[2] which regulates limited liability companies. In its second point, Pitman contends Burghoff lacked apparent authority to bind Pitman as its agent because neither Moore nor Sensakovic took any action to create the appearance that Burghoff had apparent authority to act for Pitman.

In its third point on appeal, Pitman claims the trial court erred in finding that Howard, as the transferee of the Note and Deed of Trust, acquired the rights of a holder in due course and was immune to Pitman's defense of Burghoff's lack of authority. Pitman claims Rockwood Bank had notice of Burghoff's lack of authority to execute the loan documents, and therefore was not a holder in due course. Pitman further argues that even if Rockwood Bank was deemed to be a holder in due course, Howard took the Note and Deed of Trust with notice of Pitman's defense that Burghoff lacked authority to execute the documents. As a result, Pitman claims Howard was not a holder in due course.

In its fourth point, Pitman argues that the trial court erred in finding that Howard acquired rights of a holder in due course with respect to the Deed of Trust because the Deed of Trust was not a negotiable instrument containing an "unconditional promise to pay a fixed amount of money."

In its fifth and final point on appeal, Pitman claims the trial court erred in refusing to admit Rockwood Bank's title insurance policy into evidence.

## Standard of Review

■ Appellate review of a judge tried case is governed by *Murphy v. Carron,*

536 S.W.2d 30, 32 (Mo. banc 1976). There, the Missouri Supreme Court held that the trial court's judgment will be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Leonard v. Robinson,* 276 S.W.3d 868, 873 (Mo.App. E.D.2009), *citing Murphy,* 536 S.W.2d at 32. In applying this standard, an appellate court defers to the trial court's determinations of credibility, and views all evidence in the light most favorable to the trial court's judgment and disregards all contrary evidence. *Motorsport Mktg., Inc. v. Wiedmaier, Inc.,* 195 S.W.3d 492, 497 (Mo.App. W.D.2006). Credibility of witnesses and the weight to be given to their testimony is a matter for the trial court, which is free to believe none, part, or all of any witness's testimony. *Gaar v. Gaar's Inc.,* 994 S.W.2d 612, 616 (Mo.App. S.D.1999).

## Discussion

For the sake of clarity, we review Pitman's first two points out of order, addressing first the issue of Burghoff's apparent authority to bind Pitman, and secondly, whether Burghoff's actions were consistent with the requirements of Section 347.065.

## I. Burghoff's apparent authority to execute the loan documents.

■ Pitman argues that Burghoff lacked authority to enter into the loan transaction with Rockwood Bank. The parties do not dispute that Burghoff lacked actual authority to close the loan transaction on behalf of Pitman, as the Operating Agreement expressly limited Burghoff's authority as manager to transactions not exceeding $50,000. The only source of au-

2. All further statutory references are to RSMo (2000), unless otherwise indicated.

thority that could allow Burghoff to bind Pitman on the Rockwood Bank loan transaction is apparent authority. Pitman claims that Burghoff lacked apparent authority to execute the Rockwood Bank loan documents on behalf of Pitman because neither Moore nor Sensakovic acted in any way to create the appearance that Burghoff had authority to act for Pitman, and that Rockwood Bank should have questioned Burghoff's authority to execute the loan transaction. We acknowledge the presence of troubling facts in the record, including Burghoff's fraudulent and dishonest conduct again Pitman and its members. While this is a close case, we are unable to conclude that the trial court's finding that Burghoff acted with apparent authority was against the weight of the evidence, not supported by substantial evidence, or an erroneous application of the law.

 A principal is responsible for the acts and agreements of its agent, but only if the agent acts with authority—either actual authority, which may be express or implied, or apparent authority. *Lynch v. Helm Plumbing and Elec. Contractors, Inc.*, 108 S.W.3d 657, 660 (Mo.App. W.D. 2002). In the absence of actual authority, an agent's acts may still be binding on a principal if the acts are performed with "apparent authority." *Id.* "Apparent authority" exists when a principal, either by its acts or representations, has led third persons to believe authority has been conferred upon an agent. *Id.* To establish apparent authority, a party must show: "(1) the principal manifested his consent to the exercise of such authority or knowingly permitted the agent to assume the exercise of such authority; (2) the person relying on this exercise of authority knew of the facts and, acting in good faith, had reason to believe, and actually believed, the agent possessed such authority; and (3) the per-

son relying on the appearance of authority changed his position and will be injured or suffer loss if the transaction executed by the agent does not bind the principal." *Id.*; *see also IOS Capital, LLC v. Allied Home Mortgage Capital Corp.*, 150 S.W.3d 148, 153 (Mo.App. E.D.2004).

 "When a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform a particular act on behalf of his principal, the principal is estopped, as against such innocent third person, from denying the agent's authority to perform the act." *K & G Farms v. Monroe County Serv. Co.*, 134 S.W.3d 40, 43 (Mo.App. E.D.2003). Typically "any conduct by the principal which, if reasonably interpreted, would cause a third person to believe that the principal consents to the acts of the agent is sufficient to create apparent authority." *Lynch*, 108 S.W.3d at 660.

 Once established, apparent authority is the equivalent of expressly conferred authority as to third parties. *Utley Lumber Co. v. Bank of the Bootheel*, 810 S.W.2d 610, 613 (Mo.App. S.D.1991). Where there is apparent authority and an innocent third party relies on it, the principal is estopped to deny the agent's authority. *Id.* "We assess apparent authority according to the reasonable interpretations that a third party would make." *Lynch*, 108 S.W.3d at 661.

Having reviewed the record, we hold that there is substantial evidence to support the trial court's finding of apparent authority. In particular, substantial evidence exists that Burghoff had apparent authority to enter into transactions such as the Rockwood Bank loan transaction under the Operating Agreement. The evidence

supports a finding that Rockwood Bank relied on the express language of the Operating Agreement in determining that Burghoff was authorized to execute the loan transaction on behalf of Pitman. The trial court similarly relied on the Operating Agreement in concluding that Burghoff entered into the loan transaction with apparent authority, thereby binding Pitman to the transaction. Pitman cloaked Burghoff with apparent authority when it manifested its consent for Burghoff to act as "Manager" of Pitman in the Operating Agreement, and gave the "Manager" general authority to enter into transactions such as the Rockwood Bank loan transaction.

The Operating Agreement named Burghoff as the sole manager of Pitman. As the sole manager, Burghoff was vested with certain authority to act on behalf of Pitman. More specifically, the Operating Agreement provided that the "management and control of the business and affairs of [Pitman] shall be vested exclusively in the Managers." Although granting the manager broad authority over Pitman's business affairs, the Operating Agreement placed limits on that authority, and required the consent of all members if the manager, among other things, sought to "sell, assign, pledge, or encumber any property of [Pitman]," with a value in excess of $50,000. The evidence is not disputed that Burghoff altered the Operating Agreement to reflect his authority as manager to include property with a value to $750,000. However, the trial court found that Rockwood Bank was unaware of the $50,000 limitation on the manager's authority. While evidence of Rockwood Bank's knowledge of the $50,000 limitation was disputed at trial, we defer to the trial court's credibility determinations and findings on this issue. Substantial evidence supports the trial court's findings that Rockwood Bank had no knowledge that Burghoff's authority was limited to $50,000, and reasonably believed Burghoff was authorized as Pitman's manager to enter into transactions valued up to $750,000. Given these findings, we consider whether Burghoff's admitted fraud deprived him of apparent authority to conclude the loan transaction with Rockwood Bank despite Rockwood Bank's reasonable belief to the contrary.

"When a principal cloaks his agent with apparent authority, the principal can be vicariously liable to wronged third parties *even when the agent acts wholly out of personal motive or with the purpose of defrauding his principal and even when the principal is innocent and deprived of any benefit.*" *Premium Fin. Specialists, Inc. v. Hullin*, 90 S.W.3d 110, 113 (Mo. App. W.D.2002) (emphasis added). In *Hullin*, an officer of a corporation submitted a false loan application to a financing company with whom the corporation worked on a regular basis. *Id.* at 112. Though the financing company had a reasonable good faith basis for believing that the officer had authority to act on behalf of the corporation in obtaining the loan, the officer in fact fabricated the scheme to obtain the funds for his own use. *Id.* In holding the corporation vicariously liable for its agent's actions, the Western District noted that, "[a] corporation is liable for a fraud perpetrated on a third person by its agent within the apparent scope of his authority or the course of his employment even where the wrongful acts are ultra vires or in fraud of the corporation itself, and despite the fact that the corporation did not authorize, concur in, or know of, the fraud." *Id.* at 113, *quoting State on Inf. Taylor v. Am. Ins. Co.*, 355 Mo. 1053, 200 S.W.2d 1, 40 (1946).

While this Court recognizes the loss incurred by Pitman as a result of

Burghoff's fraudulent modification of the Operating Agreement, the loss stems from actions of its member and manager, Burghoff, and not from the actions of Rockwood Bank. Through its Operating Agreement, Pitman held Burghoff out to the public as the sole manager of Pitman with the exclusive authority to manage and control Pitman's business affairs. Moreover, the Operating Agreement expressly stated that the purpose for which Pitman was organized included the acquisition of real property, and to borrow money, and issue evidence of indebtedness and secure same by security interest pledge or lien. Burghoff's dealing with Rockwood Bank, and his representations to Rockwood Bank regarding his authority to execute the loan transaction were consistent with Pitman's stated business purpose and the designation of Burghoff as Pitman's sole manager.

■ Pitman's Operating Agreement provides evidence that Pitman manifested its consent to Burghoff's exercise of such authority, or knowingly permitted Burghoff to assume the exercise of such authority. Moreover, substantial evidence was presented that Rockwood Bank knew of the Operating Agreement and, acting in good faith, reasonably believed that Burghoff possessed the authority to execute the loan transaction on behalf of Pitman. Salzman, vice president of Rockwood Bank, testified that Burghoff represented to him that he was the manager of Pitman, and that Burghoff had authority to bind Pitman for the loan request. Salzman further testified that Rockwood Bank had no information or knowledge that Burghoff was not authorized to sign on behalf of Pitman, or that Burghoff had altered the Operating Agreement to misuse his authority as manager. Salzman testified that Rockwood Bank would not have closed on the loan had it known Burghoff was not authorized to sign on behalf of Pitman. Rockwood Bank's loan processor

similarly testified that Burghoff never indicated that he lacked authority to execute the Note and Deed of Trust on behalf of Pitman, and that she believed Burghoff to have the requisite authority to execute the loan documents.

Regarding the third element necessary to find apparent authority, the record contains sufficient evidence that a loss and injury would result if the loan transaction executed by Burghoff does not bind Pitman.

Pitman argues that the trial court's finding of apparent authority is erroneous because it is well established that an agent cannot create his own authority. We agree with Pitman's recitation of the legal principle, but disagree with its characterization of the facts of this case. Here, the members of Pitman cloaked Burghoff with the apparent authority necessary to bind Pitman. Burghoff did not create the appearance of authority in himself. Rather, the manifestation of Burghoff's authority was conferred by each of Pitman's members upon the execution of its Operating Agreement.

The record supports the trial court's finding that Pitman vested Burghoff with apparent authority to negotiate and execute the type of transaction at issue in this case. Having done so, Pitman is responsible for Burghoff's acts and agreements with Rockwood Bank as if the acts were Pitman's own. The evidence presented at trial is sufficient to support the trial court's finding that Burghoff had apparent authority to act on behalf of Pitman, and therefore bind Pitman with his signature on the Rockwood Bank loan documents. Pitman's second point on appeal is denied.

**II. Burghoff's actions were consistent with the requirements of Section 347.065.**

■ Having concluded that Burghoff acted with apparent authority to bind Pit-

man under common law agency principles, we now address Pitman's statutory argument that Burghoff's conduct does not bind Pitman because the execution of the Rockwood Bank loan documents was not "apparently for the carrying on the usual way of business or affairs" of Pitman as required under Section 347.065. We disagree and find that substantial evidence was presented to demonstrate that the Rockwood Bank loan transaction was consistent with the "usual way of business or affairs" of Pitman.

■ A limited liability company is a creature of statute and its corresponding rights and obligations are derived from statute. In Missouri, the agency relationship of managers and members of a limited liability company is set forth in Section 347.065, which states that:

> 2. If the articles of organization provide that management of the limited liability company is vested in one or more managers:
>
> . . .
>
> (2) Every manager is an agent of the limited liability company for the purpose of its business and affairs, and the act of any manager for *apparently carrying on in the usual way of the business or affairs of the limited liability company* of which he is a manager binds the limited liability company, unless the manager so acting has, in fact, no authority to act for the limited liability company in the particular matter, and the person with whom he is dealing has knowledge of the fact that the manager has no such authority.
>
> 3. An act of a member or manager which is not *apparently for the carrying on the usual way of the business or affairs of the limited liability company* does not bind the limited liability company unless authorized in accordance with the terms of the operating agreement, at

the time of the transaction or at any other time. (emphasis added)

Pitman argues that even if Burghoff is deemed to have had apparent authority to bind Pitman under common law principles of agency, the language of Section 347.065 precludes a finding that Burghoff's actions were binding on Pitman because Burghoff's actions were not "apparently for the carrying on the usual way of the business or affairs" of Pitman. Pitman asserts that the usual business and affairs of Pitman related solely to the collection and distribution of rents under the Property's lease, and therefore the Rockwood Bank loan transaction did not bind Pitman under Section 347.065 because the loan had no relation to Pitman's ongoing business operations.

Viewing the evidence in the light most favorable to the trial court's verdict, we find that substantial evidence exists in the record to support a finding that the Rockwood Bank loan transaction was for the "carrying on the usual way of the business" of Pitman. The Pitman Operating Agreement specifically stated that the purpose for which Pitman was organized was:

> To engage in any lawful business for which a limited liability company may be organized under the Missouri Limited Liability Company Act, including, but not limited to, buying or otherwise acquiring, owning, holding, leasing, managing and controlling real property; and
>
> To acquire any and all property whether tangible or intangible, personal, real or mixed, of whatever kind, to enter into and perform contracts of any kind necessary to, in connection with, or incidental to the accomplishment of the aforesaid purposes, and which may be in the best interests of the Company, and to borrow money and issue evidences of indebtedness and to secure the same by

security interest, pledge or other lien in furtherance of the purposes of the Company.

The Operating Agreement provides substantial evidence that executing a loan on the Property was within the realm of "apparently carrying on in the usual way of the business" for Pitman. The Operating Agreement expressly states that, "[h]olding, leasing, managing and controlling real property," as well as "borrow[ing] money and issu[ing] evidences of indebtedness," and securing the indebtedness by security interest, pledge or other lien are the purposes for which Pitman was created. Given this broad statement of purpose, a court could reasonably find that the Rockwood Bank loan transaction was in furtherance of the company's business. This language provides substantial evidence from which a court could find Burghoff was "apparently carrying on in the usual way of the business or affairs of the limited liability company" when he executed the loan documents on behalf of Pitman.

In addition to the evidence of the Operating Agreement, the trial testimony also supports a finding that the Rockwood Bank loan transaction was "carrying on the usual way of business." Salzman testified that Burghoff needed the loan for refinancing and investment purposes related to the company. Not only were the loan documents signed by Burghoff, on behalf of Pitman, but a portion of the loan proceeds were used to release Pitman's prior lien obligations on the Property, and the remainder of the proceeds were deposited into Pitman's bank account. Substantial evidence exists in the record to support a finding that the Rockwood Bank loan was for the "carrying on the usual way of the business" of Pitman.

The trial court's finding that the Rockwood Bank loan documents were binding on Pitman is supported by substantial evi-

dence, is not against the weight of the evidence, and does not erroneously declare or apply the law. Pitman's point is denied.

## III. Howard is a holder in due course under the "shelter rule."

In its third point on appeal, Pitman claims the trial court erred in finding Howard acquired rights of a holder in due course and therefore, was not subject to Pitman's defense based on Burghoff's lack of authority. Pitman argues that Howard was not a holder in due course in its own right because Howard acquired the Rockwood Bank loan documents with actual notice of Pitman's claim that Burghoff lacked authority to execute the loan documents. Pitman also posits that Howard could not attain holder in due course status through Rockwood Bank because Rockwood Bank also had notice that Burghoff lacked authority to execute the loan documents, thereby depriving Rockwood Bank of holder in due course status. Because Howard's rights as a holder in due course primarily stem from Rockwood Bank's relationship with Pitman, we first consider Rockwood Bank's status as a holder in due course.

### (a) Rockwood Bank's status as a holder in due course.

In considering Pitman's arguments, we must examine the statute which defines holder in due course status.

Section 400.3–302(a) states that a holder of an instrument is a "holder in due course" if the holder took the instrument:

(i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an

unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 400.3–306, and (vi) without notice that any party has a defense or claim in recoupment described in Section 400.3–305(a).

Pitman argues that Rockwood Bank is not a holder in due course because it took the Note and Deed of Trust from Pitman with notice that the loan documents contained an unauthorized signature. Section 400.1–201(25) defines "Notice" as having actual knowledge, receiving notification, or having reason to know from all the facts and circumstances known at the time in question. Section 400.1–201(44) further defines an "unauthorized signature" as "one made without actual, implied, or apparent authority and includes a forgery." Refined to simpler terms, Pitman avers that Rockwood Bank cannot be a holder in due course of the loan documents because it had reason to know from the facts and circumstances of the transaction that Burghoff signed the loan documents without Pitman's actual, implied, or apparent authority.

Pitman argues that Rockwood Bank's receipt of the Operating Agreement provided it with actual notice that Burghoff did not have authority under Section 3.2(a) to "take cash out of [Pitman] without the consent of [Moore and Sensakovic]." Pitman summarily concludes from this provision that Rockwood Bank had "actual notice" that Burghoff lacked authority to execute the Rockwood Bank Note and Deed of Trust. We find Pitman's bootstrapping argument unpersuasive.

Section 3.2 of the Operating Agreement addresses the members' capital accounts and is irrelevant to the issues raised on appeal. Pitman does not demonstrate how this section is applicable to the issues before us. Pitman's assertions that Rockwood Bank's knowledge of Section 3.2 was sufficient notice that Burghoff lacked authority to "take cash out of [Pitman]" fails because there is no evidence that Rockwood Bank knew the loan transaction was structured to take cash out of Pitman or withdraw Burghoff's share of the capital or net profits. To the contrary, the loan transaction was simply borrowing money for the company using the Property as collateral, an action specifically authorized under Section 5.1 of the Operating Agreement.

Pitman also argues that Rockwood Bank had notice of Burghoff's lack of authority given the facts and circumstances known to Rockwood Bank at the time of the loan transaction. Pitman claims such knowledge precludes Rockwood Bank from satisfying the statutory definition of a holder in due course. This argument also fails. As discussed in Pitman's first two points on appeal, substantial evidence was presented to support the trial court's finding that Burghoff had apparent authority to act on behalf of, and bind, Pitman to the Rockwood Bank loan transaction, including the Note and Deed of Trust. In fact, the trial court specifically found that "[n]o evidence exists that Rockwood Bank did not act in good faith or had any knowledge that Burghoff did not have the authority to execute the Note and Deed of Trust." The trial court explained that the testimony of the Rockwood Bank employees clearly established that Rockwood Bank took the Note and Deed of Trust "in good faith and without notice that the Note and Deed of Trust contained an unauthorized signature." The record does not support a finding that Rockwood Bank had "notice" of any unauthorized signature. The record reveals that Burghoff presented himself to Rockwood Bank as acting on behalf of Pitman, presented the Operating Agree-

ment to demonstrate his authority to act on behalf of Pitman, and never indicated he was acting in any other way other than on behalf of Pitman. Rockwood Bank believed Burghoff was taking the loan out on the Property for purposes consistent with Pitman's business and the loan proceeds were deposited in Pitman's bank accounts.

To support the other elements required to achieve holder in due course status, the trial court also found that there was no dispute that:

> Rockwood Bank took the Note and Deed of Trust for value, without notice that the Note was overdue or had been dishonored or that there is an uncured default with respect to payment of another instrument as part of the same series, without notice that the Note and Deed of Trust had been altered, without notice of any claim to the Note and Deed of Trust as described in [Section] 400.3–306 and without notice that any party had a defense or claim in recoupment.

As the trial court found, and substantial evidence was presented to support, Rockwood Bank had no knowledge that Burghoff was not authorized to execute the loan documents as manager of, and on behalf of, Pitman. The trial court also determined that Burghoff's testimony was without value or credibility, and that Rockwood Bank had no knowledge that Burghoff's authority was limited to $50,000 by the Operating Agreement.

Substantial evidence exists on the record to support the trial court's finding that Rockwood Bank was without knowledge or notice of Burghoff's lack of actual authority and that Rockwood Bank was a holder in due course.

**(b) Howard's holder in due course status under the "shelter rule."**

■ In the second portion of its third point, Pitman argues that even if Rockwood Bank was a holder in due course, Rockwood Bank took the documents subject to Pitman's personal defenses, including the defense that Burghoff acted without authority, and therefore Howard was also subject to Pitman's personal defenses. We agree with Pitman that Rockwood Bank, as the original obligee, was potentially subject to Pitman's defenses despite its, holder in due course status. However, Howard nevertheless obtained full status as a holder in due course, free from all personal defenses, under the "shelter rule," Section 400.3–203(b).

### i. Rockwood Bank's status, as the original payee/obligee of the Note, to Pitman's personal defenses.

Given the intricacies of the law relating to holder in due course, our analysis of Rockwood Bank's potential liability to Pitman on the loan documents does not end with our holding that Rockwood Bank was a holder in due course. In finding that Rockwood Bank was a holder in due course, the trial court concluded that Rockwood Bank "took the Note and Deed of Trust free of all personal and ordinary defenses." However, because Rockwood Bank was the original payee on the Note, this holding erroneously declared the law.

■ While Rockwood Bank, or any payee of an instrument, may qualify as a holder in due course, because the payee is involved in the underlying transaction giving rise to the instrument and has dealt with the maker or drawer of the instrument, the payee nevertheless will be subject to that entity's defenses. Section 400.3–302; Section 400.3–305. As Comment 4 of Section 3–302 of the U.C.C. explains, courts previously were divided as to whether the payee of an instrument could be a holder in due course. However, with

the revisions to U.C.C. Section 3–302, the Comment indicates that "[t]he payee of an instrument can be a holder in due course, but use of the holder-in-due-course doctrine by the payee of an instrument is not the normal situation." *Id.*; *See also Dalton & Marberry, P.C. v. Nationsbank,* 982 S.W.2d 231, 235 (Mo. banc 1998) ("Although it is appropriate in a few instances to allow the payee of an instrument to assert rights as a holder in due course, in the typical case the holder in due course is not the payee of the instrument. Rather, the holder in due course is an immediate or remote transferee of the payee." (internal quotations omitted)). In fact, because the "primary importance of the concept of holder in due course is with respect to assertion of defenses or claims in recoupment (Section 3–305) and of claims to the instrument (Section 3–306)," where the obligor is the only obligor on the note, the holder-in-due-course doctrine is irrelevant in determining rights between the obligor and obligee with respect to the instrument because the obligor retains its defenses against the obligee. *Id.* Thus, while Rockwood Bank may be a holder in due course, it is nevertheless subject to the defenses of Pitman because Rockwood Bank was the payee/obligee involved in the initial transaction.

Although Rockwood Bank is subject to the personal defenses of Pitman, the obligor under the loan documents, this fact is irrelevant to our analysis because we have already held that Burghoff acted with apparent authority when he executed the Rockwood Bank loan documents. Accordingly, Pitman's personal defense that Rockwood Bank took the loan documents when it either knew or had reason to know from the facts and circumstances of the transaction that Burghoff's signature was unauthorized, fails. The record before us shows that Pitman has no personal defense against Rockwood Bank because Bur-ghoff's signature on the loan documents was "authorized." Because Pitman's alleged defense of "unauthorized signatures" is not supported by the evidence, Rockwood Bank's status as the payee/obligee of the loan documents is of no consequence.

### ii. Howard's holder in due course status, as transferee, under the "shelter rule."

 We must next examine what holder in due course protections Howard acquired, if any, when Rockwood Bank transferred the Note and Deed of Trust to Howard.

Pitman asserts that Howard is not a holder in due course because Howard had notice of the Burghoff's unauthorized signatures on the loan documents at the time it acquired the Note and Deed of Trust from Rockwood Bank. Our review of the record supports Pitman's claim that Howard acquired the Note and Deed of Trust with knowledge of the challenge to Burghoff's authority. Given this fact, Howard may not qualify as a holder in due course in its own right. However, under Section 400.3–203(b), the "shelter rule," Howard may lawfully claim holder in due course status because Howard obtained Rockwood Bank's holder in due course status upon the transfer of the Note and Deed of Trust.

At trial, Pitman presented evidence of Howard's admissions that Howard's representative was present at the foreclosure sale of the Rockwood Bank Deed of Trust, and that, prior to calling the sale, Pitman announced to the bidders in attendance that Pitman had filed a lawsuit alleging the Rockwood Bank Deed of Trust was invalid, and that Pitman had recorded a lis pendens with respect to the lawsuit.

To be considered a holder in due course in its own right, Howard must prove that it

meets the statutory requirements of a holder in due course, including that Howard acquired the Note and Deed of Trust "without notice that the instrument contains an unauthorized signature or has been altered." Section 400.3–302(a). As we noted in our analysis of Rockwood Bank's status as a holder in due course, "notice" is defined in Section 400.1–201(25) as "(a) a person has actual knowledge of it; or (b) a person has received a notice or notification of it; or (c) from all the facts and circumstances known to him or her at the time in question he or she has reason to know that it exists." Although the trial court made no factual findings on this particular point, substantial evidence exists on the record that Howard was aware of Pitman's defense of "unauthorized signatures" when it obtained the Note and Deed of Trust. Given this evidence, it is improbable at best that Howard could attain status as a holder in due course on its own. But for the "shelter rule," our analysis would end here and Howard likely would be subject to Pitman's personal defenses. However, under the "shelter rule," as codified by Missouri statute, Howard, despite its individual deficiencies, accedes to those rights and benefits held by Rockwood Bank as a holder in due course.

The "shelter rule," codified in Section 400.3–203(b) provides that:

> Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.

■ Through this provision the transferee of an instrument, notwithstanding a potential defense, nevertheless acquires the rights of the transferor. *Bremen Bank and Trust Co. of St. Louis v. Muskopf*, 817 S.W.2d 602, 607 (Mo.App. E.D. 1991) ("The transfer of an instrument vests in the transferee such rights as the transferor has therein, but only to the extent of the interest transferred."); *Cantrell v. Cafourek*, 513 S.W.2d 690, 694 (Mo. App.1974). Under this principle, Howard, as transferee, acquired Rockwood Bank's rights in the instruments, as transferor, including Rockwood Bank's rights as a holder in due course. In essence, the rights and protections to which Rockwood Bank is entitled as a holder in due course inure to the benefit of Howard even though Howard, in its own right, may not be entitled to holder in due course status.

The application of the "shelter rule" allows Howard the status as a holder because Rockwood Bank was properly found to be a holder in due course by the trial court. We need engage in no further analysis of the relationships of the parties because, as a holder in due course, Howard acquired the loan documents free of all personal and ordinary defenses. Pitman suggests in its brief that Rockwood Bank's status as the payee/holder of the Note deprives Howard of its status as a holder in due course. We find no such limitation expressed in Section 400.3–203(b) and are not aware of any case law supporting this argument. We are not persuaded and decline to limit the application of the "shelter rule" as suggested by Pitman. As such, we find the trial court properly found that Howard acquired the Note and Deed of Trust free of Pitman's defense that Burghoff lacked authority to bind Pitman to the Rockwood Bank loan transaction.

Pitman's third point on appeal is denied.

## IV. Rockwood Bank Deed of Trust is a negotiable instrument.

■ In its fourth point on appeal, Pitman argues that Howard is not a holder in

due course under Missouri law because Howard does not hold an "instrument" as defined by Missouri statute. Section 400.3–302 defines a "holder in due course" as a holder of an "instrument" and defines "instrument" as a "negotiable instrument." Section 400.3–104(b). A "negotiable instrument" is defined as "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order," if certain additional requirements are met. Section 400.3–104(a). Pitman contends that the Deed of Trust is not a negotiable instrument because it is not "an unconditional promise or order to pay a fixed amount of money," but merely creates a security interest in the Property to secure payment of the Rockwood Note. *See id.* Accordingly, Pitman argues that Howard may not avail itself to the protections afforded a holder in due course under Missouri law. We disagree.

Pitman's argument is simply incorrect. As this Court explained in *Bellistri v. Ocwen Loan Servicing, LLC*, 284 S.W.3d 619, 623 (Mo.App. E.D.2009):

> Generally, a mortgage loan consists of a promissory note and security instrument, usually a mortgage or a deed of trust, which secure payment on the note by giving the lender the ability to foreclose on the property. Typically, the same person holds both the note and the deed of trust.
>
> . . .
>
> When the holder of the promissory note assigns or transfers the note, the deed of trust is also transferred. An assignment of the deed of trust separate from the note has no "force." Effectively, the note and the deed of trust are inseparable, and when the promissory note is transferred, it vests in the transferee "all the interest, rights, powers and security conferred by the deed of trust upon the beneficiary therein and the payee in the notes." (internal citations omitted).

Other courts have made similar holdings, noting that "[a] deed of trust securing a negotiable note passes with it and if held by a holder in due course, the deed of trust has the same characteristics of negotiability and freedom from secret equities as does the note." *Goetz v. Selsor*, 628 S.W.2d 404, 405 (Mo.App. S.D. 1982). Also, "[w]here the parties to a note contemporaneously execute another written contract, such as a deed of trust, which is connected with the note by direct reference or by necessary implication, the two instruments should be considered together as the entire contract." *Jenkins v. Thyer*, 760 S.W.2d 932, 935–36 (Mo.App. S.D. 1988).

The Deed of Trust, as part of the loan closing and contemporaneous execution of the Note, passed with the Note and shares the same characteristics of negotiability as does the Note. Because the Rockwood Bank Deed of Trust is a negotiable instrument under Section 400.3–104, we hold that the trial court did not erroneously apply the law in treating the Deed of Trust as a negotiable instrument under the statute.

Pitman's fourth point on appeal is denied.

### V. Pitman abandoned its final point on appeal.

In its fifth point on appeal, Pitman claims the trial court erred in refusing to admit into evidence Exhibit 43, the title insurance policy issued to Rockwood Bank in connection with the Rockwood Bank loan to Pitman. Pitman argues the title insurance policy is evidence of Rockwood Bank's failure to diligently investigate the circumstances surrounding the loan trans-

action. While Pitman asserts these legal conclusions, it fails to sufficiently develop this claim of error in its brief. Pitman's failure amounts to an abandonment of this point on appeal.

 To properly brief a case with this Court, "an appellant is required to develop the issue raised in the point relied on in the argument portion of the brief." *Carlisle v. Rainbow Connection, Inc.*, 300 S.W.3d 583, 585 (Mo.App. E.D.2009). "The argument should develop the claim of error by showing the interaction between the relevant principles of law and the facts of the particular case." *Johnson v. Buffalo Lodging Assoc.*, 300 S.W.3d 580, 582 (Mo.App. E.D.2009); *see also Citizens for Ground Water Prot. v. Porter*, 275 S.W.3d 329, 348 (Mo.App. S.D.2008) ("An argument must explain why, in the context of the case, the law supports the claim of reversible error. It should advise the appellate court how principles of law and the facts of the case interact.").

Here Pitman's "argument" section fails to sufficiently develop the point on appeal. The argument does not cite to the transcript where Exhibit 43 was supposedly offered, and then rejected, as evidence. The argument fails to explain in what manner the trial court erred in rejecting the exhibit. Pitman simply alleges conclusions of law, without demonstrating the interaction between any principles of law and the facts of this case.

 Furthermore, the argument section contains no citations to legal authority regarding the substantive portion of the argument.[3] Precedent is clear that where a party "does not support contentions with relevant authority or argument beyond conclusory statements, the point is deemed

abandoned." *Johnson*, 300 S.W.3d at 582; *Carlisle*, 300 S.W.3d at 585. "If a point is not a matter of first impression and precedent is available, with limited exceptions, the appellant must cite to authority if [he] wishes to prevail." *Johnson v. Buffalo Lodging Assoc.*, 300 S.W.3d 580, 582 (Mo. App. E.D.2009).

Pitman's argument for this point leaves this Court in the position to act as an advocate for Pitman's cause by searching for factual and legal support of its claims. This we will not do. In light of these failures, the Court deems Pitman's final point on appeal to be abandoned.

### Conclusion

The judgment of the trial court is affirmed.

ROBERT G. DOWD, JR. and NANNETTE A. BAKER, JJ., Concur.

---

**3.** Pitman cites to one case regarding the standard of review, but cites no authority regard-

ing the admission or exclusion of evidence.